722 F.2d 1063
 9 Collier Bankr.Cas.2d 941, 11 Bankr.Ct.Dec. 553,
Bankr. L. Rep. P 69,510
 In re the LIONEL CORPORATION, Lionel Leisure, Inc.,
Consolidated Toy Company, Debtors.
The COMMITTEE OF EQUITY SECURITY HOLDERS, Appellant,
v.
The LIONEL CORPORATION, Applicant-Appellee,
Peabody International Corporation, Committee of Unsecured
Creditors and Securities and Exchange Commission, Appellees.
 No. 517, Docket 83-5060.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 31, 1983.
Decided Nov. 29, 1983.
 
 Laurence J. Kaiser, Kronish, Lieb, Shainswit, Weiner & Hellman, New York City (Richard Lieb, New York City, of counsel), for respondent-appellant The Committee of Equity Security Holders.
 Leonard J. Connolly, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for applicant-appellee Lionel Corp.
 Gary Blum, Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City (Michael V. Blumenthal, David M. Friedman, New York City, of counsel), for respondent-appellee Peabody Intern. Corp.
 Alan B. Miller, Weil, Gotshal & Manges, New York City (Marcia L. Goldstein, Tonny K. Ho, New York City, of counsel), for respondent-appellee Committee of Unsecured Creditors.
 Jerome Feller, New York City, Asst. Regional Administrator, S.E.C. (Paul Gonson, Sol., Anne E. Chafer, Asst. Gen. Counsel, Ruth S. Epstein, Sp. Counsel, Bruce Kohn, Atty., S.E.C., Washington, D.C., of counsel), for appellee, S.E.C.
 Before MANSFIELD, CARDAMONE and WINTER, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This expedited appeal is from an order of United States District Judge Dudley B. Bonsal dated September 7, 1983, approving an order entered earlier that day by the United States Bankruptcy Court for the Southern District of New York (Ryan, J.). The order authorized the sale by Lionel Corporation, a Chapter 11 debtor in possession, of its 82% common stock holding in Dale Electronics, Inc. to Peabody International Corporation for $50 million.[1]I--FACTS
 
 
 2
 On February 19, 1982 the Lionel Corporation--toy train manufacturer of childhood memory--and two of its subsidiaries, Lionel Leisure, Inc. and Consolidated Toy Company, filed joint petitions for reorganization under Chapter 11 of the Bankruptcy Code. Resort to Chapter 11 was precipitated by losses totalling $22.5 million that Lionel incurred in its toy retailing operation during the two year period ending December 1982.
 
 
 3
 There are 7.1 million shares of common stock of Lionel held by 10,000 investors. Its consolidated assets and liabilities as of March 31, 1983 were $168.7 million and $191.5 million, respectively, reflecting a negative net worth of nearly $23 million. Total sales for 1981 and 1982 were $295.1 million and $338.6 million. Lionel's creditors hold approximately $135.6 million in pre-petition claims, and they are represented in the ongoing bankruptcy proceedings by an Official Creditors' Committee whose 13 members hold $80 million of those claims. The remaining $55 million is scattered among thousands of small creditors.
 
 
 4
 Lionel continues to operate its businesses and manage its properties pursuant to 11 U.S.C. Secs. 1107-1108, primarily through its wholly-owned subsidiary, Leisure. Leisure operates Lionel's presently owned 56 specialty retail stores, which include a number of stores formerly managed by Lionel's other subsidiary, Consolidated Toy. In addition to the stock of Leisure and Consolidated Toy, Lionel has other assets such as the right to receive royalty payments relating to the manufacture of toy trains.
 
 
 5
 Lionel's most important asset and the subject of this proceeding is its ownership of 82% of the common stock of Dale, a corporation engaged in the manufacture of electronic components. Dale is not a party to the Lionel bankruptcy proceeding. Public investors own the remaining 18 percent of Dale's common stock, which is listed on the American Stock Exchange. Its balance sheet reflects assets and liabilities as of March 31, 1983 of $57.8 million and $29.8 million, respectively, resulting in shareholders equity of approximately $28.0 million. Lionel's stock investment in Dale represents approximately 34 percent of Lionel's consolidated assets, and its interest in Dale is Lionel's most valuable single asset. Unlike Lionel's toy retailing operation, Dale is profitable. For the same two-year period ending in December 1982 during which Lionel had incurred its substantial losses, Dale had an aggregate operating profit of $18.8 million.
 
 
 6
 On June 14, 1983 Lionel filed an application under section 363(b) seeking bankruptcy court authorization to sell its 82% interest in Dale to Acme-Cleveland Corporation for $43 million in cash. Four days later the debtor filed a plan of reorganization conditioned upon a sale of Dale with the proceeds to be distributed to creditors. Certain issues of the reorganization remain unresolved, and negotiations are continuing; however, a solicitation of votes on the plan has not yet begun. On September 7, 1983, following the Securities and Exchange Commission's July 15 filing of objections to the sale, Bankruptcy Judge Ryan held a hearing on Lionel's application. At the hearing, Peabody emerged as the successful of three bidders with an offer of $50 million for Lionel's interest in Dale.
 
 
 7
 The Chief Executive Officer of Lionel and a Vice-President of Salomon Brothers were the only witnesses produced and both testified in support of the application. Their testimony established that while the price paid for the stock was "fair," Dale is not an asset "that is wasting away in any sense." Lionel's Chief Executive Officer stated that there was no reason why the sale of Dale stock could not be accomplished as part of the reorganization plan, and that the sole reason for Lionel's application to sell was the Creditors' Committee's insistence upon it. The creditors wanted to turn this asset of Lionel into a "pot of cash," to provide the bulk of the $70 million required to repay creditors under the proposed plan of reorganization.
 
 
 8
 In confirming the sale, Judge Ryan made no formal findings of fact. He simply noted that cause to sell was sufficiently shown by the Creditors' Committee's insistence upon it. Judge Ryan further found causepresumably from long experience--based upon his own opinion that a present failure to confirm would set the entire reorganization process back a year or longer while the parties attempted to restructure it.
 
 
 9
 The Committee of Equity Security Holders, statutory representatives of the 10,000 public shareholders of Lionel, appealed this order claiming that the sale, prior to approval of a reorganization plan, deprives the equity holders of the Bankruptcy Code's safeguards of disclosure, solicitation and acceptance and divests the debtor of a dominant and profitable asset which could serve as a cornerstone for a sound plan. The SEC also appeared and objected to the sale in the bankruptcy court and supports the Equity Committee's appeal, claiming that approval of the sale side-steps the Code's requirement for informed suffrage which is at the heart of Chapter 11.
 
 
 10
 The Creditors' Committee favors the sale because it believes it is in the best interests of Lionel and because the sale is expressly authorized by Sec. 363(b) of the Code. Lionel tells us that its ownership of Dale, a non-operating asset, is held for investment purposes only and that its sale will provide the estate with the large block of the cash needed to fund its plan of reorganization.
 
 
 11
 From the oral arguments and briefs we gather that the Equity Committee believes that Chapter 11 has cleared the reorganization field of major pre-plan sales--somewhat like the way Minerva routed Mars--relegating Sec. 363(b) to be used only in emergencies. The Creditors' Committee counters that a bankruptcy judge should have absolute freedom under Sec. 363(b) to do as he thinks best. Neither of these arguments is wholly persuasive. Here, as in so many similar cases, we must avoid the extremes, for the policies underlying the Bankruptcy Reform Act of 1978 support a middle ground--one which gives the bankruptcy judge considerable discretion yet requires him to articulate sound business justifications for his decisions.
 
 II--DISCUSSION
 
 12
 The issue now before this Court is to what extent Chapter 11 permits a bankruptcy judge to authorize the sale of an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization. Section 363(b), the focal point of our analysis, provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. Sec. 363(b) (Supp. V 1981).
 
 
 13
 On its face, section 363(b) appears to permit disposition of any property of the estate of a corporate debtor without resort to the statutory safeguards embodied in Chapter 11 of the Bankruptcy Code, 11 U.S.C. Sec. 1101 et seq. (Supp. V 1981). Yet, analysis of the statute's history and over seven decades of case law convinces us that such a literal reading of section 363(b) would unnecessarily violate the congressional scheme for corporate reorganizations.
 
 
 14
 A. Bankruptcy Act of 1867--the "Perishable" Standard
 
 
 15
 An early statutory reference providing for the sale of a debtor's property prior to final liquidation of the estate in limited circumstances was Section 25 of the Bankruptcy Act of 1867 (Act of March 2, 1967, 14 Stat. 517). Congress there stated:
 
 
 16
 "And be it further enacted, That when it appears to the satisfaction of the court that the estate of the debtor, or any part thereof, is of a perishable nature, or liable to deteriorate in value, the court may order the same to be sold, in such manner as may be deemed most expedient, under the direction of the messenger or assignee, as the case may be, who shall hold the funds received in place of the estate disposed of ...." (emphasis added and in original).
 
 
 17
 The 1867 Act did not provide for reorganizations; nevertheless, the requirements that the property be of a perishable nature or liable to deteriorate in value and that there be loss if the same is not sold immediately were also found in General Bankruptcy Order No. XVIII(3), adopted by the Supreme Court in 1898. General Order in Bankruptcy No. XVIII, 89 F. viii (November 28, 1898).
 
 
 18
 From 1898 through 1937, the Bankruptcy Act did not contain a specific provision permitting pre-adjudication sales of a debtor's property. But, pursuant to General Order XVIII, this Circuit over fifty years ago upheld an order that approved a private, pre-adjudication sale of a bankrupt's stock of handkerchiefs. Not only was merchandise sold at a price above its appraised value, but Christmas sales had commenced and the sale of handkerchiefs would decline greatly after the holidays. Our court held that the concept of "perishable" was not limited to its physical meaning, but also included property liable to deteriorate in price and value. In re Pedlow, 209 F. 841, 842 (2d Cir.1913). See Hill v. Douglass, 78 F.2d 851, 853-54 (9th Cir.1935) (sale of road-making equipment of a contractor to prevent its repossession approved).
 
 
 19
 B. Chandler Act of 1938--The "Upon Cause Shown" Standard
 
 
 20
 Section 116(3) of the 1938 Act, which was the immediate predecessor of Sec. 363(b), was originally enacted as section 77B(c) in 1937. Section 116(3) provided:
 
 
 21
 "Upon the approval of a petition, the judge may, in addition to the jurisdiction, powers and duties hereinabove and elsewhere in this chapter conferred and imposed upon him and the court ... (3) authorize a receiver or a trustee or a debtor in possession, upon such notice as the judge may prescribe and upon cause shown, to lease or sell any property of the debtor, whether real or personal, upon such terms and conditions as the judge may approve."
 
 
 22
 This section applied in Chapter X proceedings, and a similar provision, Sec. 313(2), pertained to Chapter XI cases. Thus, when reorganization became part of the bankruptcy law, the long established administrative powers of the court to sell a debtor's property prior to adjudication were extended to cover reorganizations with a debtor in possession under Chapter XI pursuant to Sec. 313(2), 11 U.S.C. Secs. 701 et seq., as well as a trustee in control under Chapter X pursuant to Sec. 116(3), 11 U.S.C. Secs. 501 et seq. These sections, as their predecessors, were designed to handle leases or sales required during the time lag between the filing of a petition for reorganization and the date when the plan was approved.[2]
 
 
 23
 The Rules of Bankruptcy Procedure applicable in Chapters X and XI, the Act's reorganization procedures, provided for a sale of all or part of a bankrupt's property after application to the court and "upon cause shown." Rules 10-607(b), 11-54. Despite the provisions of this Rule, the "perishable" concept, expressed in the view that a pre-confirmation or pre-adjudication sale was the exception and not the rule, persisted. As one commentator stated, "[o]rdinarily, in the absence of perishable goods, or depreciation of assets, or actual jeopardy of the estate, a sale will not be ordered, particularly prior to adjudication." 1 Collier on Bankruptcy p 2.28(3) (14th ed. 1978) (footnotes omitted).
 
 
 24
 Thirty years after In re Pedlow, supra, in Frank v. Drinc-O-Matic, Inc., 136 F.2d 906 (2d Cir.1943), we upheld the sale of a debtor's 19 vending machines that were subject to a vendor's lien and in the possession of their manufacturer. We noted that the trustee had no funds with which to redeem the machines and that six months had passed from the filing of the petition without proposal of a reorganization plan. Finally, we stated that appellate review of the power exercised by a lower court in directing a sale pursuant to Sec. 116(3) was limited to whether the district court had abused its discretion. Id. at 906.
 
 
 25
 Citing Sec. 116(3) of the Act, we next affirmed an order of a sale of vats, kettles and other brewing machinery which, with " 'the approach of warm weather ... will, because of lack of use and refrigeration, deteriorate rapidly and lose substantially all their value.' " In re V. Loewer's Gambrinus Brewery Co., 141 F.2d 747, 748 (2d Cir.1944). While the court acknowledged the viability of the "perishable" property concept, it upheld the sale even though virtually all of the income producing assets of the debtor were involved. The same proceeding, then entitled Patent Cereals v. Flynn, 149 F.2d 711 (2d Cir.1945), came before us the following year. We said it made no difference whether sale of a debtor's property preceded or was made part of a plan of reorganization. Id. at 712. Nothing, we continued, in former section 216 (providing for the sale of a reorganizing debtor's property pursuant to a plan) precluded approval of a plan after a sale of all or a substantial part of the debtor's property. Section 216 merely permitted a plan providing for such sale and did not forbid a plan after such a sale has already taken place. Id. at 713.
 
 
 26
 Judge Ryan, in authorizing the sale of the Dale stock cited Patent Cereals as his authority. Appellees here cite Patent Cereals for the proposition that this court has abandoned the perishable property or emergency concept. We reject such a broad reading of Patent Cereals for several reasons. First, the decision involved an appeal from a denial of confirmation of a plan of reorganization, i.e., the sale in that case was a fait accompli, it was not as here an appeal from an authorization of sale. Second, the earlier decision in Loewer's Gambrinus Brewery, supra, indicates that the court did view the original sale as involving perishable property. Third, subsequent cases in this Circuit confirm the misapprehension in appellees' and Judge Ryan's broad interpretation. See In re Sire Plan, Inc., 332 F.2d 497 (2d Cir.1964); In re Pure Penn Petroleum Co., Inc., 188 F.2d 851 (2d Cir.1951).
 
 
 27
 The Third Circuit took an even stricter view in In re Solar Mfg. Corp., 176 F.2d 493 (3d Cir.1949). Acknowledging that a sale of corporate assets could occur outside and prior to a plan, yet expressing concern that sales of that nature do not adequately "protect the interests of those whose money is tied up in the tottering enterprise," the court concluded that pre-confirmation sales should be "confined to emergencies where there is imminent danger that the assets of the ailing business will be lost if prompt action is not taken." Id. at 494. This "emergency" approach was so appealing that our court cited Solar Mfg. Corp. with approval and held in In re Pure Penn Petroleum Co., 188 F.2d 851 (2d Cir.1951), that the debtor must plead and prove "the existence of an emergency involving imminent danger of loss of the assets if they were not promptly sold." Id. at 854.
 
 
 28
 Finally, in In re Sire Plan, Inc., 332 F.2d 497 (2d Cir.1964), corporate owners of a seven-story skeletal building then under construction filed for reorganization under Chapter X of the Act. Because of the site's close proximity to the impending 1964 World's Fair, Holiday Inns felt it was a favorable location for a hotel and accordingly offered to purchase it. The sale to Holiday Inns was affirmed under the Patent Cereal rationale. The Court stated that there is no requirement that the sale be in aid of a reorganization; but we further noted, as in Pure Penn, that the evidence demonstrated that in its exposed state a "partially constructed building is a 'wasting asset' [that] can only deteriorate in value the longer it remains uncompleted." Id. at 499.
 
 
 29
 More recently, other circuits have upheld sales prior to plan approval under the Bankruptcy Act where the bankruptcy court outlined the circumstances in its findings of fact indicating why the sale was in the best interest of the estate. E.g., In re Equity Funding Corporation of America, 492 F.2d 793, 794 (9th Cir.1974), cert. denied, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974) (finding of fact that because market value of asset was likely to deteriorate substantially in the near future, sale was in the estate's best interests); In re Dania Corporation, 400 F.2d 833, 835-37 (5th Cir.1968), cert. denied, 393 U.S. 1118, 89 S.Ct. 994, 22 L.Ed.2d 122 (1969) (upholding sale of stock representing debtor's major asset where its value was rapidly deteriorating causing the reorganizing estate to diminish); In re Marathon Foundry and Machine Co., 228 F.2d 594 (7th Cir.1955) (heavy interest charges justified sale of stock which had been pledged to secure loan). In essence, these cases evidence the continuing vitality under the old law of an "emergency" or "perishability" standard. As we shall see, the new Bankruptcy Code no longer requires such strict limitations on a bankruptcy judge's authority to order disposition of the estate's property; nevertheless, it does not go so far as to eliminate all constraints on that judge's discretion.
 
 C. The Bankruptcy Reform Act of 1978
 
 30
 Section 363(b) of the Code seems on its face to confer upon the bankruptcy judge virtually unfettered discretion to authorize the use, sale or lease, other than in the ordinary course of business, of property of the estate. Of course, the statute requires that notice be given and a hearing conducted, but no reference is made to an "emergency" or "perishability" requirement nor is there an indication that a debtor in possession or trustee contemplating sale must show "cause." Thus, the language of Sec. 363(b) clearly is different from the terms of its statutory predecessors. And, while Congress never expressly stated why it abandoned the "upon cause shown" terminology of Sec. 116(3), arguably that omission permits easier access to Sec. 363(b). See In re Brookfield Clothes, Inc., 31 B.R. 978, 984 (S.D.N.Y.1983). Various policy considerations lend some support to this view.
 
 
 31
 First and foremost is the notion that a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code. As Justice Holmes once said in a different context, "[s]ome play must be allowed for the joints of the machine ...." Missouri, Kansas & Texas Ry. Co. v. May, 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971 (1904). To further the purposes of Chapter 11 reorganization, a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances. This is exactly the result a liberal reading of Sec. 363(b) will achieve.
 
 
 32
 Support for this policy is found in the rationale underlying a number of earlier cases that had applied Sec. 116(3) of the Act. In particular, this Court's decision in Sire Plan was not hinged on an "emergency" or "perishability" concept. Lip service was paid to the argument that a partially constructed building is a "wasting asset;" but the real justification for authorizing the sale was the belief that the property's value depended on whether a hotel could be built in time for the World's Fair and that an advantageous sale after the opening of the World's Fair seemed unlikely. Thus, the reason was not solely that a steel skeleton was deteriorating, but rather that a good business opportunity was presently available, so long as the parties could act quickly. In such cases therefore the bankruptcy machinery should not straightjacket the bankruptcy judge so as to prevent him from doing what is best for the estate.
 
 
 33
 Just as we reject the requirement that only an emergency permits the use of Sec. 363(b), we also reject the view that Sec. 363(b) grants the bankruptcy judge carte blanche. Several reasons lead us to this conclusion: the statute requires notice and a hearing, and these procedural safeguards would be meaningless absent a further requirement that reasons be given for whatever determination is made; similarly, appellate review would effectively be precluded by an irreversible order; and, finally, such construction of Sec. 363(b) swallows up Chapter 11's safeguards. In fact, the legislative history surrounding the enactment of Chapter 11 makes evident Congress' concern with rights of equity interests as well as those of creditors.[3]
 
 
 34
 Chapter 5 of the House bill dealing with reorganizations states that the purpose of a business reorganization is to restructure a business' finances to enable it to operate productively, provide jobs for its employees, pay its creditors and produce a return for its stockholders. The automatic stay upon filing a petition prevents creditors from acting unilaterally or pressuring the debtor. Report of the Committee on the Judiciary, House of Representatives, to accompany H.R. 8200, H.R.Rep. No. 95-595, 95th Cong. 1st Sess. (1977) at 16, U.S.Code Cong. & Admin.News, 1978, p. 5787, reprinted in 2 Collier on Bankruptcy (appendix) (15th ed. 1983) (hereinafter H.R.Rep. No. 95-595). The plan of reorganization determines how much and in what form creditors will be paid, whether stockholders will continue to retain any interests, and in what form the business will continue. Requiring acceptance by a percentage of creditors and stockholders for confirmation forces negotiation among the debtor, its creditors and its stockholders. Id. at 221. A fair analysis of the House bill reveals that reorganization under the 1938 Chandler Act, though designed to protect creditors had, over the years, often worked to their detriment and to the detriment of shareholders as well. Id. at 221. The primary reason reorganization under the Act had not served well was that disclosure was minimal and reorganization under the Act was designed to deal with trade debt, not secured or public debt or equity. The present bill, it was believed, provides some form of investor protection to make it a "fairer reorganization vehicle." Id. at 226. The key to the reorganization Chapter, therefore, is disclosure. Id. To make disclosure effective, a provision was included that there be a disclosure statement and a hearing on the adequacy of the information it contains. Id. at 227. The essential purpose served by disclosure is to ensure that public investors are not left entirely at the mercy of the debtor and its creditors. For that reason the Securities and Exchange Commission, for example, has an absolute right to appear and be heard on behalf of the public interest in an orderly securities market. Id. at 228.
 
 
 35
 The Senate hearings similarly reflect a concern as to how losses are to be apportioned between creditors and stockholders in the reorganization of a public company. S.Rep. No. 95-989, 95th Cong. 2d Sess. 9 (1978), reprinted in 3 Collier on Bankruptcy (appendix) (15th ed. 1983) (hereinafter S.Rep. No. 95-989). Noting that "the most vulnerable today are public investors," the Senate Judiciary Committee Report states that the bill is designed to counteract "the natural tendency of a debtor in distress to pacify large creditors with whom the debtor would expect to do business, at the expense of small and scattered public investors." S.Rep. No. 95-989 at 10, U.S.Code Cong. & Admin.News p. 5796. The Committee believed that investor protection is most critical when the public company is in such financial distress as to cause it to seek aid under the bankruptcy laws. Id. The need for this protection was plain. Reorganization under the 1938 Act was often unfair to public investors who lacked bargaining power, and these conditions continued. Echoing the conclusion of the House Committee, the Senate Committee believed that the bill would promote fairer and more equitable reorganizations granting to public investors the last chance to conserve values that corporate insolvency has jeopardized. Id. at 10-11.
 
 III--CONCLUSION
 
 36
 The history surrounding the enactment in 1978 of current Chapter 11 and the logic underlying it buttress our conclusion that there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b).
 
 
 37
 The case law under section 363's statutory predecessors used terms like "perishable," "deteriorating," and "emergency" as guides in deciding whether a debtor's property could be sold outside the ordinary course of business. The use of such words persisted long after their omission from newer statutes and rules. The administrative power to sell or lease property in a reorganization continued to be the exception, not the rule. Collier on Bankruptcy p 2.28(b) (supra ). In enacting the 1978 Code Congress was aware of existing case law and clearly indicated as one of its purposes that equity interests have a greater voice in reorganization plans--hence, the safeguards of disclosure, voting, acceptance and confirmation in present Chapter 11.
 
 
 38
 Resolving the apparent conflict between Chapter 11 and Sec. 363(b) does not require an all or nothing approach. Every sale under Sec. 363(b) does not automatically short-circuit or side-step Chapter 11; nor are these two statutory provisions to be read as mutually exclusive. Instead, if a bankruptcy judge is to administer a business reorganization successfully under the Code, then--like the related yet independent tasks performed in modern production techniques to ensure good results--some play for the operation of both Sec. 363(b) and Chapter 11 must be allowed for.
 
 
 39
 The rule we adopt requires that a judge determining a Sec. 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application. In this case the only reason advanced for granting the request to sell Lionel's 82 percent stock interest in Dale was the Creditors' Committee's insistence on it. Such is insufficient as a matter of fact because it is not a sound business reason and insufficient as a matter of law because it ignores the equity interests required to be weighed and considered under Chapter 11. The court also expressed its concern that a present failure to approve the sale would result in a long delay. As the Supreme Court has noted, it is easy to sympathize with the desire of a bankruptcy court to expedite bankruptcy reorganization proceedings for they are frequently protracted. "The need for expedition, however, is not a justification for abandoning proper standards." Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 450, 88 S.Ct. 1157, 1176, 20 L.Ed.2d 1 (1968). Thus, the approval of the sale of Lionel's 82 percent interest in Dale was an abuse of the trial court's discretion.
 
 
 40
 In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.
 
 
 41
 Finally, we must consider whether appellants opposing the sale produced evidence before the bankruptcy court that such sale was not justified. While a debtor applying under Sec. 363(b) carries the burden of demonstrating that a use, sale or lease out of the ordinary course of business will aid the debtor's reorganization, an objectant, such as the Equity Committee here, is required to produce some evidence respecting its objections. Appellants made three objections below: First, the sale was premature because Dale is not a wasting asset and there is no emergency; second, there was no justifiable cause present since Dale, if anything, is improving; and third, the price was inadequate. No proof was required as to the first objection because it was stipulated as conceded. The second and third objections are interrelated. Following Judge Ryan's suggestion that objections could as a practical matter be developed on cross-examination, Equity's counsel elicited testimony from the financial expert produced by Lionel that Dale is less subject than other companies to wide market fluctuations. The same witness also conceded that he knew of no reason why those interested in Dale's stock at the September 7, 1983 hearing would not be just as interested six months from then.[4] The only other witness who testified was the Chief Executive Officer of Lionel, who stated that it was only at the insistence of the Creditors' Committee that Dale stock was being sold and that Lionel "would very much like to retain its interest in Dale." These uncontroverted statements of the two witnesses elicited by the Equity Committee on cross-examination were sufficient proof to support its objections to the present sale of Dale because this evidence demonstrated that there was no good business reason for the present sale. Hence, appellants satisfied their burden.
 
 
 42
 Accordingly, the order appealed from is reversed and the matter remanded to the district court with directions to remand to the bankruptcy court for further proceedings consistent with this opinion.
 
 WINTER, Circuit Judge, dissenting:
 
 43
 In order to expedite the decision in this matter, I set forth my dissenting views in summary fashion.
 
 
 44
 The following facts are undisputed as the record presently stands: (i) Lionel sought a buyer for the Dale stock willing to condition its purchase upon confirmation of a reorganization plan. It was unsuccessful since, in the words of the bankruptcy judge, "the confirmation of any plan is usually somewhat iffy," and few purchasers are willing to commit upwards of $50 million for an extended period without a contract binding on the other party; (ii) every feasible reorganization plan contemplates the sale of the Dale stock for cash; (iii) a reorganization plan may be approved fairly soon if the Dale stock is sold now. If the sale is prohibited, renewed negotiations between the creditors and the equity holders will be necessary, and the submission of a plan, if any, will be put off well into the future; and (iv) the Dale stock can be sold now at or near the same price as it can be sold later.
 
 
 45
 The effect of the present decision is thus to leave the debtor in possession powerless as a legal matter to sell the Dale stock outside a reorganization plan and unable as an economic matter to sell it within one. This, of course, pleases the equity holders who, having introduced no evidence demonstrating a disadvantage to the bankrupt estate from the sale of the Dale stock, are now given a veto over it to be used as leverage in negotiating a better deal for themselves in a reorganization.
 
 
 46
 The likely results of today's decision are twofold: (i) The creditors will at some point during the renewed protracted negotiations refuse to extend more credit to Lionel, thus thwarting a reorganization entirely; and (ii) notwithstanding the majority decision, the Dale stock will be sold under Section 363(b) for exactly the same reasons offered in support of the present proposed sale. However, the ultimate reorganization plan will be more favorable to the equity holders, and they will not veto the sale.
 
 
 47
 It seems reasonably obvious that result (i) is something that the statutory provisions governing reorganizations, including Section 363(b), are designed to avoid. Result (ii) not only is contrary to the purpose of the reorganization provisions in causing delay and further economic risk but also suffers from the legal infirmity which led the majority to reject the proposed sale, the only difference between the two sales being the agreement of the equity holders.
 
 
 48
 The equity holders offered no evidence whatsoever that the sale of Dale now will harm Lionel or that Dale can in fact be sold at a reasonable price as part of a reorganization plan. The courts below were quite right in not treating their arguments seriously for they are the legal equivalent of the "Hail Mary pass" in football.[1]
 
 
 
 [1]
 The agreement between Lionel and Peabody provides that the parties will be relieved of their respective obligations to purchase and sell the Dale shares unless the closing takes place on or before November 30, 1983. In section 1.03 of the contract, the parties specifically contemplated the possibility of "a stay pending disposition of any appeal from the bankruptcy court's order." On November 22, 1983 Peabody made a motion under Fed.R.App.P. 27 requesting in part that this court extend the November 30 deadline. In view of the contract language, Peabody bargained for this provision. Accordingly, we deny its motion
 
 
 [2]
 A letter from a district judge in California addressed to the House Committee holding hearings on these sections illustrates one of the reasons for the addition in 1937 of rules permitting pre-confirmation sales. The letter recounted the difficulty the writer had in a reorganization involving a California land company whose business consisted of selling real property. Because of the lack of clear authority to sell, title companies refused to certify title to the land during the time interval after a petition had been filed and prior to plan approval. The writer therefore recommended adoption of legislation that would grant the bankruptcy judge authority to issue orders during the time from filing to approval permitting the sale or lease of the debtor's property. Letter of United States District Judge Leon R. Yankwich to Reuben G. Hunt, April 16, 1937. Hearing on H.R. 6439 and H.R. 8046, 75th Cong., 1st Sess. (1937) at 222
 
 
 [3]
 The Commission on the Bankruptcy Laws of the United States submitted a draft provision that would have permitted resort to section 363(b) in the absence of an emergency, even in the case of "all or substantially all the property of the estate." See Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, 93rd Cong., 1st Sess. (1973) at 239 (proposed Sec. 7-205 and accompanying explanatory note). Congress eventually deleted this provision without explanation, an action which we hardly consider dispositive of the issue before us here
 
 
 [4]
 As noted, the bidding for Dale started with a $43 million offer from Acme-Cleveland and has since jumped to $50 million. There is no indication that this trend will reverse itself
 
 
 [1]
 With due respect to my colleagues, the problem of statutory interpretation is entirely straightforward and not deserving of a lengthy exegesis into legal history. The language of Section 363(b) is about as plain as it could be and surely does not permit a judicial grafting of stringent conditions on the power of trustees. As for its legislative history, the words "upon cause shown" were dropped by the Congress from the predecessor to Section 363(b) in 1978, a signal clearly dictating that Congress meant what it said
 The equity holders argue that Chapter 11's provisions for disclosure, hearing and a vote before confirmation of a reorganization plan stringently limit the authority of trustees under 11 U.S.C. Sec. 363(b). However, a reorganization plan affects the rights of the parties as well as the disposition of assets, and there is no inconsistency in allowing the disposition of property outside the confirmation proceedings. Arguably, some transactions proposed under Section 363(b) would, if carried out, eliminate a number of options available for reorganization plans and thereby pre-ordain a particular kind of plan or preclude a reorganization entirely. In such a case, a colorable claim can be made for a limitation on a trustee's power under Section 363(b) narrowly tailored to prevent such a result in order to effectuate the core purposes of Chapter 11. However, it is not disputed that in the present case the final reorganization plan will include a sale of Dale stock. A sale now thus does not preclude any feasible reorganization plan.