**In the Matter of BRETHREN CARE OF SOUTH BEND, INC., Debtor.**

**Bankruptcy No. 85–31102–RKR.**

United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

March 27, 1989.

Joseph Bradley and Aladean DeRose, South Bend, Ind., for Debtor.

Timothy Abeska and Richard Mintz, South Bend, Ind., for Creditors Committee (representing the interests of the residents of St. Paul's facility).

Charles Greer, Indianapolis, Ind., for 1st Source Bank Bondholders.

Gary Boyn, Elkhart, Ind., for Official Bondholders Committee.

Christopher Potts, South Bend, Ind., for State Court Receiver.

Donald Snyder, Wallace Handler, Southfield, Mich., and David B. Weisman, South Bend, Ind., for P.M. Equities, Inc.

Ernest Szarwark, South Bend, Ind., trustee, for Noteholders Valley American Bank.

Thomas Lewis and John Van Laere, South Bend, Ind., for Holy Cross Care Services, Inc.

### ORDER

ROBERT K. RODIBAUGH, Senior Bankruptcy Judge.

On December 16, 1988, Brethren Care of South Bend, Inc., d/b/a St. Paul's Retirement Community ("Brethren Care"), the debtor herein, filed Debtor's Second Application to Sell All Real Estate and Substan-

tially All Personal Property and to Disburse Sale Proceeds to Secured Creditors. On the same date Brethren Care filed Debtor's Application for Order Regarding Conduct of Sale of Real and Personal Property. The court held an expedited hearing on these matters on December 30, 1988, at which time all interested parties agreed to the sale and agreed to submit a suggested form of entry and notice regarding the conduct of the sale. On January 3, 1989, the court issued its Order Regarding Conduct of Sale of Real and Personal Property setting forth the terms and conditions under which competing bids for the purchase of Brethren Care's property were to be submitted. The parties agreed that the sale of the debtor's property would take place on March 3, 1989, at which time the court would consider any and all bona fide, competing bids on the property.

Pursuant to its Order of January 23, 1989, the court continued the hearing on Debtor's Second Application to Sell All Real Estate and Substantially All Personal Property originally scheduled for March 3, 1989, to March 23, 1989. On March 22, 1989, P.M. Equities, Inc. ("P.M. Equities"), a Michigan corporation, and bondholders Donald Wheeler, Dominick Mikutis, and Gerald Krueger filed their Objection to Auction Sale and a Memorandum of Law in Support of Objection to Auction Sale. On the same date Donald Wheeler, Dominick Mikutis, and Gerald Krueger filed a Plan of Re–Organization for the debtor. On March 23, 1989, Brethren Care filed Debtor's Response to Objection to Auction Sale and a Memorandum in Support of Auction Sale. The court held a hearing on Brethren Care's application and the objection thereto on March 23, 1989, and permitted the sale to go forward subject to the objection to the sale which was taken under advisement.[1]

### Background

Brethren Care is a not-for-profit corporation whose primary asset is a retirement and nursing care facility located in South Bend, Indiana ("St. Paul's facility"). The Brethren Care facility was built and financed by a bond issue in 1978 establishing an indebtedness of approximately $7,825,-000.00. In 1983 when Brethren Care encountered serious financial problems, a series of notes were issued establishing an additional indebtedness of approximately $7,800,000.00. Brethren Care's two major secured creditors accordingly are 1st Source Bank of South Bend, Indiana, as Series 1978 Bond Trustee ("1st Source") and Valley American Bank of South Bend, Indiana, as Series 1983 Note Trustee ("Valley American"). These creditors hold first and second mortgages on Brethren Care's real and personal property. In 1985 in the midst of a second financial upheaval, the Board of Directors of Brethren Care resigned and 1st Source petitioned the St. Joseph Superior Court[2] to appoint a receiver to file a Chapter 11 proceeding for Brethren Care.

Brethren Care filed its petition under Chapter 11 of the Bankruptcy Code on October 10, 1985. On the same date Brethren Care filed its Disclosure Statement and Plan of Reorganization. Brethren Care filed its Amended Disclosure Statement and Plan of Reorganization on October 18, 1985; however, at this date a plan has not been confirmed.

On December 17, 1985, Brethren Care filed its Application for Approval of Management Agreement requesting permission to enter into a management agreement with St. Joseph's Residential Services, Inc., a not-for-profit corporation with its principal office located in South Bend, Indiana. The court approved the management agreement on December 17, 1985. Since that time St. Joseph's Residential Services, Inc., has operated the St. Paul's facility. On December 23, 1985, Brethren Care filed its Application for Approval of Option Agreement. Pursuant to the option

---

1. On March 24, 1989, Brethren Care filed its Report of Sale indicating that after the bid process was closed Holy Cross was the successful bidder with its offer of $7,400,000.00.

2. Cause No. R–3324 captioned First Source Bank, Trustee, v. Brethren Care of South Bend, Inc., in the St. Joseph Superior Court, State of Indiana, County of St. Joseph.

agreement Brethren Care requested the court's permission to purchase assets of Brethren Care, subject to the liabilities of Brethren Care, for $1.00; or to exercise a right of first refusal to purchase the assets on the same terms and conditions as any bona fide offer to purchase the assets. The court approved the option agreement on February 7, 1986.

Pursuant to the court's Order of May 12, 1986, Brethren Care furnished its Interim Status Report to All Creditors summarizing the administration and management, operations, and financial condition of the St. Paul's facility and indicating that the court had granted Brethren Care until July 7, 1986, to file an amended plan of reorganization. The report stated that in order to submit a Second Amended Plan of Reorganization Brethren Care needed to ascertain the fair market value of its assets. In the report Brethren Care further indicated that, after consulting with 1st Source and Valley American, it had determined that the most effective manner in which to determine the current fair market value of the assets of Brethren Care was to solicit offers for the purchase of the assets. Thereafter, on June 5, 1986, pursuant to the application of Brethren Care and 1st Source the court issued its Agreed Order for Adequate Protection providing that Brethren Care was to begin making monthly adequate protection payments to 1st Source in the amount of $57,036.60 per month commencing on April 1, 1986.[3] On August 29, 1986, the court permitted Brethren Care to issue its Second Interim Status Report of Debtor-in-Possession to all creditors. This report explained, in addition to other matters, that Brethren Care had contacted seven investment banking companies in an effort to offer the assets of Brethren Care for sale and had selected A.G. Edwards & Sons, Inc. ("A.G. Edwards"), of St. Louis, Missouri, to begin the marketing process.

On August 27, 1986, Brethren Care filed its Application to Sell Real and Personal Property Free and Clear of Liens and to Employ Investment Banker to Assist in Sale. In the application Brethren Care submitted that the sale of all of its assets would provide a potential basis for its reorganization as an ongoing health care and retirement facility and would permit Brethren Care to satisfy its creditors from the proceeds of the sale. Brethren Care further asked permission to employ A.G. Edwards and indicated that both 1st Source and Valley American had submitted their written consents to the sale. On October 6, 1986, the court issued its order authorizing employment of A.G. Edwards to solicit offers to purchase the assets of Brethren Care.

On March 24, 1987, Brethren Care filed its Third Interim Status Report of Debtor-in-Possession which indicated that Brethren Care had converted an unoccupied independent living floor of the St. Paul's facility into an assisted living floor in an effort to accommodate the apparent need for assisted living apartments in the South Bend area. In the report Brethren Care submitted that full occupancy of the converted floor would generate approximately $57,-000.00 in additional monthly revenue to Brethren Care. Concerning the sale process, the report indicated that A.G. Edwards had advised Brethren Care to delay the sale of Brethren Care's assets approximately three months in order to allow new residents to begin moving into the new assisted living floor thereby perhaps increasing the fair market value of the St. Paul's facility. On April 9, 1987, Brethren Care filed Debtor's Application to Delay Solicitation of Offers to Purchase and to Extend Employment of Investment Banker which the court approved on June 17, 1987.

On March 3, 1988, Brethren Care filed its Fourth Interim Status Report of Debtor-in-Possession. The report indicated that occupancy levels in the St. Paul's facility continued at between 85% and 100% with the occupancy of assisted living units at 92% and the occupancy of independent living units at 74% showing a pattern of gradual

---

**3.** The payment of $57,036.60 equals the approximate amount of interest accruing monthly on the indebtedness to 1st Source.

increase from occupancy levels in the fall of 1985. The report further stated that due to the higher occupancy trends in assisted living quarters, Brethren Care would be converting another wing of the St. Paul's facility to an assisted living area. The report included a summary of the monthly operating reports from the filing of the Chapter 11 petition on October 10, 1985, to January, 1988, and stated that the marketing of A.G. Edwards had resulted in a high bid for Brethren Care's assets of $7,650,000.00 submitted by Wheeler Municipals Corporation ("Wheeler Corporation") of Towaco, New Jersey. On March 30, 1988, the court issued its Order Appointing Committee of Creditors for the purpose of protecting the interests of the residents of the St. Paul's facility.

On March 31, 1988, Brethren Care filed its Emergency Application for Instruction as to Sale of Facility. Brethren Care's application indicated that while its negotiations with the Wheeler Corporation resulted in a Purchase and Sale Agreement which was sent to Wheeler Corporation in the first week of March, 1988, the parties had failed to reach an agreement on several issues. In the application Brethren Care sought the court's direction as to whether it should continue or terminate negotiations with the Wheeler Corporation as the deadline for the completion of negotiations was March 31, 1988. The court held a hearing on Brethren Care's application on April 21, 1988, at which time the parties discussed the sale of assets to Wheeler Corporation. Despite the efforts of Brethren Care, the debtor was unable to negotiate a final sale to Wheeler Corporation before the bid was withdrawn.

On August 17, 1988, Holy Cross Care Services, Inc. ("Holy Cross"), an Indiana not-for-profit corporation which is a successor to St. Joseph's Residential Services, Inc., offered to purchase the assets of Brethren Care for $7,000,000.00. On October 20, 1988, the court issued its Order granting the Application for Appointment of Bondholders' Committee filed September 15, 1988. On November 21, 1988, 1st Source issued notice to all bondholders of record of a Bondholder Meeting held on August 18, 1988, at which time the bondholders discussed the possible sale of assets to Holy Cross. On December 16, 1988, Brethren Care filed Debtor's Second Application to Sell All Real Estate and Substantially All Personal Property and to Disburse Sale Proceeds to Secured Creditors along with its Application for Order Regarding Conduct of Sale of Real and Personal Property to Holy Cross for the sum of $7,000,000.00.

Following the December 30, 1988, hearing on Brethren Care's application to sell its assets to Holy Cross at which time all interested parties agreed to the sale, the court issued its Order Regarding Conduct of Sale of Real and Personal Property. The January 3, 1989, order provided the ground rules for submitting competing offers to purchase Brethren Care's property. In essence, the order provided that a person proposing to make a competing offer to purchase which was identical to that of Holy Cross was to submit its bid at the continued hearing scheduled on the debtor's application to sell and that a person proposing to make a competing offer to purchase which provided for payment of the full purchase price in cash at closing but which was not identical in all other respects to the offer of Holy Cross was to submit its bid in writing along with the terms of its offer to the State Court Receiver on or before February 24, 1989. In turn, a person proposing to make a competing offer to purchase which provided for payment of the purchase price in any manner other than payment of cash in full at closing but otherwise identical to the offer of Holy Cross was to submit its bid in writing to the State Court Receiver on or before February 6, 1989.

The order further provided for the payment of an earnest money deposit by the offerors. The order stated that at the hearing on Brethren Care's application to sell each holder of a bona fide bid would be given the opportunity to increase the dollar amount of its bid in increments of not less than $50,000.00 over and above the then highest bid until the court determined the highest and best bid among the holders of

bona fide offers. The Clerk of the Court issued a notice to all creditors of the sale of assets on January 6, 1989, setting forth the background of Brethren Care's unsuccessful attempts to sell its assets and Brethren Care's inability to generate sufficient cash flow to retire its secured debt or to make interest payments to its secured creditors, summarizing the terms of the Holy Cross offer, setting forth Brethren Care's proposed distribution of sale proceeds and its proposed liquidation following the sale, as well as Brethren Care's position that the sale was in the best interests of the debtor, its creditors, its residents and the estate. On January 30, 1989, 1st Source and Valley American filed their acknowledgments indicating that they would not object to the submission of Brethren Care's proposal to sell its assets by application rather than by a complaint to sell the property in an adversary proceeding.

Holy Cross filed its Application to Amend Notice on February 21, 1989, requesting the court to enforce its right of first refusal for any offer to purchase Brethren Care's assets. Holy Cross' application generated objections from various interested parties including the Official Bondholders Committee, Trad Associates ("Trad"), a party which had submitted a competing bid to purchase the debtor's assets,[4] and 1st Source. At the expedited hearing on this matter the objecting parties indicated to the court that they simply wished to have a "level playing field" where potential offerors proposing to submit bids for Brethren Care's assets would be treated equally and fairly. On March 14, 1989, Holy Cross filed its Application to

Withdraw Motion which the court granted on March 15, 1989. In addition to waiving its asserted right of first refusal Holy Cross increased its offer to purchase to $7,400,000.00.

Thereafter, the Objection to Auction Sale and responsive pleadings were filed which are before the court.

### Arguments of the Parties

In their Objection to Auction Sale P.M. Equities, Donald Wheeler, Dominick Mikutis and Gerald Krueger ("Objectors") assert that Brethren Care's assets have not been marketed adequately and that the price of $7,000,000.00 will yield substantially less than the dividend proposed to creditors under the Plan of Re-Organization filed by the objecting bondholders on March 22, 1989.[5] The Objectors assert that Brethren Care has shown no compelling reason for the sale of its assets and has not indicated whether other forms of reorganization, other than liquidating, will result in a higher recovery for creditors. The Objectors claim that inasmuch as the only business reason for continuing with the sale of assets is that Holy Cross' offer is the best offer to date, the court pursuant to 11 U.S.C. § 1125(b) of the Bankruptcy Code should allow creditors to vote whether to accept the proposed Plan of Re-Organization or the offers proposed by Holy Cross or other potential purchasers. The Objectors further assert that the proposed sale of Brethren Care's property is a *de facto* plan of reorganization and that the court accordingly should require Holy Cross to submit a disclosure statement for the approval of creditors.

**4.** The court notes that Trad is a subsidiary of P.M. Equities which has filed its objection to the proposed sale of assets.

**5.** The objecting bondholders' Plan of Re-Organization proposes that P.M. Equities will become the debtor and will retain and pay Holy Cross to manage the St. Paul's facility. The plan provides that priority claims and the claims of trade creditors will not be impaired, that the § 507(a)(7) claims will be impaired and paid in accordance with § 1129(a)(9)(C), and that the 1st Source bondholders may elect to satisfy their claims by either rolling over their investments by re-investing in the St. Paul's facility or

receiving an immediate cash payment of 90% of their principal due on their bonds. Through the plan the Valley American noteholders would receive a full settlement of their claims in the amount of $375,000.00. The plan further provides that life occupancy contracts shall not be increased more than 10% during any calendar year except for increases directly attributable to real estate taxes. The plan also allots $5,000.00 for the payment of unsecured creditors. Notably, if the objecting bondholders' Plan of Re-Organization is unsuccessful, P.M. Equities has guaranteed it will purchase Brethren Care's assets for $7,600,000.00.

The Objectors submit that selling Brethren Care's assets out of the ordinary course of business will deprive creditors of their rights under §§ 1125, 1126, and 1129 since the sale is not justified by an articulated business reason. Relying primarily on the factors discussed by the court in *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2nd Cir.1983), the Objectors claim Brethren Care has not met the articulated business reason test. The Objectors urge the court to refuse to allow the sale because Brethren Care has not shown that its assets are decreasing in value and because the sale would not provide the best return for creditors of the debtor. At the hearing on the objection, 1st Source and the Official Bondholders Committee indicated that they support the position of the Objectors.

Brethren Care, on the other hand, requests the court to deny the objection to the sale of its assets. Brethren Care asserts that although it has continued operating the St. Paul's facility through the management services of Holy Cross, it has been unable to make adequate protection payments to its secured creditors as ordered by the court on June 5, 1986. Brethren Care reports that it currently is in arrears in the amount of $300,000.00 and has not been able to make any adequate protection payments in the last few months. Brethren Care submits that it has been soliciting offers for the purchase of its assets since September 3, 1986, and has been unable to reach successful negotiations with any bidder other than Holy Cross. Brethren Care notes that Donald Wheeler and Dominick Mikutis, two of the bondholders who filed the Plan of Re-Organization on March 22, 1989, are the same parties with whom the debtor unsuccessfully attempted to negotiate a sale of its assets in the spring of 1988 after receiving a bid for $7,650,000.00 from the Wheeler Corporation. Brethren Care asserts that all of its creditors including the 1st Source bondholders who now object to the sale had notice of the proposed sale of assets since early January, 1989. Brethren Care further submits that the Official Bondholders Committee of which Donald Wheeler and Dominick Mikutis are a part has argued in favor of the sale of the debtor's assets and in fact insisted upon the sale prior to the recent filing of the objection and plan herein.

Brethren Care indicates that Holy Cross may withdraw its cash bid if the court does not approve the sale on a prompt and timely basis thereby possibly leaving Brethren Care without a buyer if the proposed Plan of Re-Organization is not confirmed. Brethren Care further submits that the present value of the cash offer of Holy Cross is a higher and better offer than the proposed plan offered by the objecting bondholders which Brethren Care asserts is nothing more than a nonconforming offer to purchase its assets. Brethren Care argues that the sale is in the best interests of everyone involved and that current law does not require an "emergency" standard in order for a court to approve the sale of a debtor's assets prior to confirmation of a plan. Moreover, Brethren Care asserts that under the *Lionel* case cited by the Objectors good business reasons exist for the approval of the sale in this case. Brethren Care cites the fact that Brethren Care has been able to solicit only three offers to purchase its assets since 1986, that the sale of the assets will provide protection for residents of the facility including those who have entered into life-care contracts, that the offer presented by Holy Cross is the highest and best bid for the property, that Holy Cross may withdraw its bid if the court does not permit the sale to go forward, and that Brethren Care is unable to continue making adequate protection payments to the 1st Source bondholders in concluding that articulated business reasons exist for the sale.

At the hearing on this matter counsel for the residents of the St. Paul's facility stated that the residents are concerned about the possibility of a for-profit corporation operating the facility under the Plan of Re-Organization filed by the objecting bondholders. Inasmuch as Holy Cross already has shown its ability to manage the St. Paul's facility successfully, the resi-

dents contend the sale should go forward. The residents submit that if P.M. Equities should operate the St. Paul's facility as a for-profit corporation it will lose important tax breaks which would result in additional financial burdens being shifted to the residents of the St. Paul's facility. The residents further point out that Holy Cross will be unable to work for P.M. Equities as proposed in the plan, since it is unable to provide services for a for-profit corporation without losing its not-for-profit status. The residents assert that inasmuch as P.M. Equities and its subsidiary Trad have missed the deadline for submitting a non-conforming bid to purchase the debtor's assets, they should not be able to circumvent the court's order concerning conduct of the sale with the filing of their objection. Valley American, the State Court Receiver and Holy Cross indicated at the hearing that they support the position of Brethren Care and the residents that the sale should go forward notwithstanding the objection thereto.

### Discussion and Decision

Title 11 U.S.C. § 363(b)(1), made applicable to Chapter 11 proceedings by § 103(a), provides that "[t]he trustee, after notice and a hearing, may ... sell ..., other than in the ordinary course of business, property of the estate." 11 U.S.C.A. § 363(b)(1) (West Supp.1988). Section 363(b) is the primary section allowing the sale of a debtor's property outside the ordinary course of business and accordingly is applicable herein. *See In re Sax*, 796 F.2d 994, 997 n. 7 (7th Cir.1986). In determining whether a court should resort to a sale, a court should "consider the existing circumstances and exercise its discretion as to whether a sale should be ordered and, if so, upon what terms and conditions." *Marathon Foundry and Machine Co. v. Schwartz (In re Marathon Foundry and Machine Co.)*, 228 F.2d 594, 598 (7th Cir.1955). The factors set forth in *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2nd Cir.1983), are relevant in determining whether to resort to § 363(b). *Gekas v.*

*Pipin (In re Met–L–Wood Corp.)*, 861 F.2d 1012, 1017 (7th Cir.1988).

In order to allow some flexibility for the bankruptcy court in dealing with the competing concerns of § 363(b) and the safeguards of disclosure, voting, acceptance and confirmation in present Chapter 11, the *Lionel* court adopted the view a court approving an application to sell under § 363(b) must find a "good business reason" to grant the application. 722 F.2d at 1071. The court indicated that relevant factors in the inquiry might include:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

*Id.* In addition, the court must consider whether the party or parties objecting to the sale presented any evidence showing that the sale is not justified. *Id.*

Upon reviewing the lengthy record in this case, the arguments and evidence presented by the parties in this matter as well as the varied interests of all those involved, the court concludes that good business reasons exist for the sale of Brethren Care's assets as previously authorized by the court. The record shows that Brethren Care has had serious financial deficiencies in its operation of the St. Paul's facility since 1983 when it first defaulted on its indebtedness to the 1st Source bondholders. Even with the influx of nearly $8,000,000.00 from the sale of notes to the Valley American noteholders in 1983, Brethren Care was unable to successfully maintain its business operations. Brethren Care filed its first Disclosure Statement and Plan of Reorganization on October 10, 1985, the date it filed its Chapter 11 petition. To this date, however,

Brethren Care has been unable to file an amended · plan of reorganization which stands a chance of being approved by its creditors. In 1986, Brethren Care concluded in light of its heavy debt obligations, that the sale of all of its assets would provide the best possible basis for its reorganization as an ongoing health care and retirement facility and would permit Brethren Care to satisfy its creditors from the proceeds of the sale.[6] Hence, with the court's permission and the blessings of its secured creditors, Brethren Care hired an investment banker to solicit offers for the purchase of its assets.

Throughout this time although Brethren Care was unable to provide an amended disclosure statement and plan, it filed and served status reports upon its creditors informing them of the administration, management, operations, and financial condition of the St. Paul's facility, as well as reporting upon Brethren Care's efforts to sell its assets. Despite intense efforts to sell the property, no buyer was found until Holy Cross submitted its offer on August 17, 1988. Since that time Brethren Care has been negotiating to finalize a sale to Holy Cross or any other bidder who was willing to purchase its assets on similar terms and conditions. Throughout this process, including the hearing on Debtor's Second Application to Sell All Real Estate and Substantially All Personal Property and to Disburse Sale Proceeds to Secured Creditors on December 30, 1988, all interested parties agreed and insisted to the court that the sale was in the best interests of all parties involved.

Considering the *Lionel* factors as well as other factors integral to this case, the court concludes that the sale of the debtor's assets as previously authorized continues to be in the best interests of all parties and that valid business reasons exist for the sale. The history of the debtor's inability to recover financially due to its overwhelming indebtedness to the 1st Source and Valley American investors as well as its current inability to make even minimal adequate protection payments to the 1st Source bondholders convince the court that the sale should go forward. The court finds that the confirmation of a plan of reorganization for the debtor is unlikely in the near future even in light of the Plan of Re–Organization recently filed by the objecting bondholders. Clearly, the only feasible plan of reorganization in this case will be a liquidating plan. The court indeed would be surprised if a proposed purchaser of the debtor's assets will be willing to invest the necessary capital into the St. Paul's facility without assurance that its purchase will be free and clear of the secured obligations of Brethren Care. Moreover, even if the plan of the objecting bondholders were confirmed, the plan is worth far less to the estate than the immediate cash offer of Holy Cross. The court notes that even the plan of the objecting bondholders which is not directly before the court at this time except to the extent that it may be inferred to be part of the bondholders' objection to the sale, actually is a liquidating plan providing that P.M. Equities is to become the debtor.

In this case the parties offer conflicting views as to whether Brethren Care's assets are increasing or decreasing in value. The court concludes from the evidence presented that while the assets apparently are not decreasing rapidly in value and perhaps have increased in value to some extent as Holy Cross has converted more independent living units to assisted living units, that delay in selling the assets would not be in the best interests of the parties involved. The well-being of the residents of the St. Paul's facility is of particular concern to the court. For the past three and a half years the residents have lived in limbo not knowing the possible outcome of Brethren Care's bankruptcy and the potential impact any sale of the property or reorganization might have on them. Importantly, some of the residents have entered into life contracts with the debtor and accordingly are at the mercy of others as to decisions

---

**6.** The court notes that sale of Brethren Care's assets in effect would result in the debtor's ultimate liquidation. The potential purchaser, though, would continue to operate the St. Paul's facility as an ongoing business.

made regarding the St. Paul's facility. The residents, of course, desire what will be in their best interests in the long-run but in addition desire that the court add stability to their lives by resolving the disposition of the St. Paul's facility as soon as possible. The residents have lived with the services of Holy Cross for some time and are quite satisfied therewith. The court believes that the continuing satisfaction and ongoing beneficial treatment of the residents of the St. Paul's facility is a good business reason for the sale of Brethren Care's assets as scheduled.

Finally, the court reiterates that all interested parties in this case, including the Official Bondholders Committee of which objectors Donald Wheeler and Dominick Mikutis are a part and Trad which is a subsidiary of objector P.M. Equities, agreed to the sale of Brethren Care's assets. Due to Brethren Care's continued issuance of its interim status reports as well as reports from 1st Source, the bondholders were well informed when they made their decision to support the sale. After allowing the debtor over forty-two months to explore all avenues of reorganization it appears time to call a halt and pave the way for a liquidating plan to be filed. If the objecting bondholders had any better ideas they could have filed their own plan of reorganization over three years ago. As it stands, the Objectors along with their supporters (1st Source and the Official Bondholders Committee) have waived their right to file a plan of reorganization by agreeing to the sale of the debtor's assets as proposed in its second application to sell its assets and the court's order regarding the rules of conduct for the sale. Furthermore, the Objectors have failed to submit any good reason why the proposed sale should not go forward as scheduled.

### Conclusion

WHEREFORE, the court determines that valid business reasons exist for continuing with the sale as permitted by § 363(b) and as authorized by the court in its order of January 3, 1989, and accordingly overrules the objections thereto. The court further determines that the highest and best bid for Brethren Care's property is that of Holy Cross Care Services, Inc., which offered $7,400,000.00 for the assets pursuant to the terms of its Purchase and Sale Agreement with the debtor. The court approves the sale of Brethren Care's assets to Holy Cross Care Services, Inc., free and clear of all liens and encumbrances against the property sold. It is

SO ORDERED.