**In re CROWTHERS McCALL PATTERN, INC., d/b/a the McCall Pattern Company, Debtor.**

**Bankruptcy No. 88B–12659 (HCB).**

United States Bankruptcy Court, S.D. New York.

June 5, 1990.

As Corrected June 8, 1990.

Stroock & Stroock & Lavan, Seven Hanover Square, New York City by Robin E. Keller, Eli Levitin, for debtor-in-possession.

Skadden, Arps, Slate, Meagher & Flom, New York City by Michael L. Cook, Margaret A. Brown, Brad J. Axelrod, for creditors' committee.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Robert L. Laufer, Jeffrey K. Cymbler, Stephen K. Koo, for McCall Pattern Holdings, Inc.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Before the Court is a motion, brought jointly by Crowthers McCall Pattern, Inc. ("McCall"), debtor-in-possession herein, and the Official Creditors' Committee (the "Committee"), for an order authorizing McCall to merge with another entity if a plan of reorganization so providing is confirmed." [1]

The motion is objected to by McCall Pattern Holdings, Inc. ("Pattern"), a creditor of McCall and wholly owed by Reginald Lewis, a shareholder of McCall, principally on the grounds that there is insufficient business justification and that such authorization constitutes an improper piecemeal plan, subverting the protections afforded parties in interest to a Chapter 11 case.

This motion concerns the extent to which a debtor-in-possession and creditors' committee may put in place, prior to confirmation of a plan of reorganization, a transaction which is to form the basis of a plan. It thereby raises the tension between the need for negotiation with prospective funders of consensual plans and certainty of a return to creditors on the one hand, and the need to preserve the protections of Chapter 11 of Title 11, 11 U.S.C. § 101 *et seq.* (1986) (the "Code"), on the other. Because in this case there is a pressing need to bring a purchaser to the table and the Chapter 11 ·protections are preserved, the motion is granted.

## I

Prior to filing a petition for relief under Chapter 11 in December 1988, McCall was one of the country's three largest companies engaged in the designing, manufacturing, and marketing of home sewing patterns. As debtor-in-possession, McCall continues to operate its business. Although its market share for 1989 increased to 35.8%, the home pattern industry has declined over the past decade and McCall's

---

1. The motion originally sought, in addition, an order providing that a deposit, to be paid pursuant to the Agreement, be held in trust and approving provisions of the Agreement regarding competing transactions, including "break-up" fees. An order granting partial relief was entered after a hearing on April 10, 1990, as described below.

principal competitors have suffered. Tr. pp. 37, 126–27.[2] McCall's current sales are approximately one-third of its peak sales a decade ago. Tr. pp. 37–38. Management projects profits from operations of $10.181 million in 1990, increasing slightly annually to $12.535 million in 1994. Ex. B. McCall currently has opportunities to expand its business in, among other places, the Soviet Union, and its brand name is widely recognized. Tr. p. 39.

McCall, however, is laden with debt that it cannot service. That debt consists largely of $35 million in principal owed to The Travelers Insurance Company and The Travelers Indemnity Company, and $22 million in principal owed to subordinated bondholders. Hence, McCall sought to market the company with the assistance of Wasserstein, Perella & Co., Inc. between October 1988 and March 1989. Apparently, no offers for McCall's business or assets were then received. Tr. pp. 39, 61. The Committee, in March 1989, took on the job of marketing the debtor. It sought and obtained authority from this Court for its accountant, Ernst & Young ("E & Y"), to render financial advisory and investment banking services in connection with the sale of McCall.

Since April 1989, E & Y has attempted to attract buyers. Tr. p. 40. It distributed a confidential sale memorandum to approximately 75 to 80 parties, of whom 25 to 30 conducted detailed due diligence. Tr. pp. 40–41. Numerous other parties contacted E & Y after learning of the sale effort through word of mouth in the merger and acquisition community. Tr. p. 42.

In late summer 1989, nine parties submitted statements of interest in acquiring McCall's business. Tr. p. 54. The Committee invited five parties, which in its view submitted the most promising statements, to bid at a non-judicial auction at E & Y's office on August 31, 1989. Id. Three parties actually participated. Id. The Committee determined that Tessler & Cloherty, Inc. had offered the highest and best bid and pursued negotiations towards a definitive stock purchase agreement. Tr. pp. 54–55. Those negotiations, however, terminated in late September. Id.

McCall and the Committee then resorted to a judicial auction in attempting to attract a buyer. On their joint motion, the Court entered an order scheduling a final judicial auction of McCall's business pursuant to a plan of reorganization. Opposing papers were filed by Lewis. The auction was ultimately held on October 19, 1989. At its conclusion, the Court found that Lewis' acquisition company, having bid $43 million for McCall's business, submitted the highest and best bid. That bid was subsequently withdrawn.

At the reopened final auction on October 31, 1989, McKane Robbins & Co. ("McKane Robbins"), the sole bidder, bid $40 million. Tr. pp. 56, 127. By order dated November 1, 1989, the Court authorized and directed McCall to enter into and perform the agreement with McKane Robbins, subject to confirmation of a plan of reorganization, and directed McKane Robbins to deposit $250,000 immediately and further deposit $1.75 million within five days. For reasons that are currently the subject of litigation, including the allegation that McCall's management attempted to leverage their position, McKane Robbins did not pay the $1.75 million installment and the parties did not consummate the transaction. Tr. p. 57.

E & Y resumed its marketing efforts in early 1990. The Committee solicited new bids and sent a model acquisition agreement and guidelines and requirements for bids to approximately thirty potential acquirors. Tr. p. 43. Seven bids were made in response to the solicitation, including a bid by Dimeling & Schreiber ("D & S") on behalf of its affiliates McCall Acquisition, Inc. and MP Holdings, Inc. ("MP Holdings"). Tr. p. 44. D & S had not previously submitted a bid. Tr. p. 61.

E & Y analyzed the various bids received according to both financial and non-financial terms, including the cash consideration offered and contingencies in the bids and financing. Tr. p. 45. It advised the Com-

---

**2.** Unless otherwise indicated herein, "Tr." refers to the transcript of the hearing of May 8, 1990, and "Ex." refers to exhibits offered into evidence at that hearing.

mittee that the D & S bid was the most attractive because it offered the highest cash consideration and was not contingent on obtaining financing. The Debtor and the Committee agreed. Tr. p. 45. The Committee and D & S negotiated a written "Agreement and Plan of Merger" (the "Agreement") dated March 30, 1990 that is the subject of the instant motion.

The Agreement provides for the merging of McCall Acquisition, Inc. with and into McCall which will continue as the surviving corporation and as a subsidiary of MP Holdings. *Id.* ¶ 1.1. The Agreement is essentially pre-nuptial in nature since the merger is dependent on entry of an order of confirmation. *Id.* ¶ 5.1.

As consideration for the merger, MP Holdings is to pay $45 million, plus or minus the amount that the stockholders' equity in McCall, as shown on a balance sheet as of the closing date, is greater or less than $80,217,000, with any downward adjustment not exceeding $4.5 million. *Id.* ¶ 1.2(b)–(d) at 9, 13. Of this consideration, $2 million was paid as a deposit upon the execution of the Agreement and the balance of the purchase price with adjustments is payable at closing. *Id.* MP Holdings is also to assume non-subordinate pre-petition liabilities of McCall in the amount of $3.62 million. *Id.*, Ex. A. The Agreement requires D & S to guarantee all of the obligations of MP Holdings and McCall Acquisition, Inc., *id.* ¶ 4.6, and to provide evidence of contributing $8 million in equity to MP Holdings by May 14, 1990, *id.* ¶ 4.7.

The Agreement conditions the obligations of McCall and MP Holdings upon entry and finality of both an order granting the instant motion and authorizing the Debtor to enter into the Agreement, and an order confirming a plan of reorganization in this case. Agreement ¶¶ 5.2(e), 5.3(d). Although it is not a condition that the transaction close immediately, Tr. p. 144, McCall is obligated to use reasonable efforts to procure an order authorizing it to enter into and perform the Agreement. *Id.* ¶ 4.4. The Agreement is not binding upon McCall until entry and finality of an order granting this motion. *Id.* ¶ 2.4. Thus, for lack of consideration, it is apparently not binding on MP Holdings or D & S until an order granting this motion is entered.

As soon as practicable after entry of an order granting this motion, McCall is to file a disclosure statement and any documents necessary to confirm a plan of reorganization. Agreement ¶ 4.4. Essentially, the plan shall provide for (i) cancellation of all capital stock of McCall existing prior to the closing, (ii) assignment to creditors the consideration paid by MP Holdings and rights to certain pending litigation, (iii) assumption by the surviving company of certain pre-petition and all post-petition liabilities, *id.*, Ex. A, (iv) discharge of all other liabilities as against the surviving company, and (v) vesting in the surviving company the assets of McCall as of the closing date free and clear of all claims and encumbrances. *Id.* ¶ 4.3, Recital C.

A condition to MP Holdings' closing is that the plan, disclosure statement, and order of confirmation be "reasonably satisfactory" to it and its counsel. Agreement ¶¶ 5.2, 4.3. Specifically, the confirmation order is to confirm the plan in all material respects, approve the execution, delivery, and performance of the Agreement, approve the assumption of executory contracts and unexpired leases set forth in an exhibit to the Agreement, and, as of the date of confirmation, discharge all indebtedness to the extent permitted by the Code, except as provided in the Agreement. *Id.*

On April 10, 1990, the Court, upon motion of the Debtor and the Committee, and after a hearing, entered an order approving modified provisions of the Agreement. Those modifications require the retention in trust by McCall of the D & S deposit of $2 million pending a final order confirming a plan, allow D & S a "break-up" fee of $500,000 as an administrative expense, and provide that any party also depositing $2 million with McCall, in the period pending the hearing to approve the Agreement during which competing bids could be made, could not be outbid by a bid providing less than a $500,000 increment. Agreement ¶ 6.3 as modified.

The April 10 order also approved a provision terminating the Agreement if (i) the closing does not occur within forty-five days after entry of the order of confirmation or July 31, 1990 (except if any appeal taken has not been resolved, in which case, September 30, 1990), (ii) the case is dismissed or converted to a Chapter 7 case, or a trustee is appointed in the Chapter 11 case,[3] or (iii) McCall shall consummate a competing transaction. Agreement ¶ 6.1 as modified. Also approved was McCall's covenant not to take any action to cause, promote, authorize or result in the purchase, by any person other than MP Holdings, of the stock or assets of McCall. This covenant expressly prohibits granting access to the company's books or records, and employees or management, except as required pursuant to its fiduciary duties, or by order of the bankruptcy court. Agreement ¶ 6.3 as modified. The order further provided that D & S' $2 million deposit be returned upon termination of the Agreement if D & S is not in breach of any of its terms or if McCall enters into a competing transaction. Agreement ¶ 6.2 as modified. All potential bidders, creditors with claims in excess of $100,000, shareholders, and parties who had requested notice were served with notice of that order. Tr. p. 4.

McCall received one timely competing bid from Recovery Equity Investors, L.P. ("REI") dated April 23, 1990. Tr. pp. 4, 45–46; Ex. A. REI submitted a bid, contingent on obtaining financing, of $45 million in cash and $3 million in the form of a 9% cumulative convertible preferred stock having a liquidation preference of $3 million and redeemable in five or ten years. Tr. p. 46, 92–93, 96, 105. The preferred stock would be convertible at anytime into 8% of the common stock of REI's acquisition vehicle. *Id.* E & Y discounted the REI bid by $2.6 million. $500,000 was subtracted for the break-up fee which would be due D & S were REI's bid successful. An addi-

tional $400,000 was subtracted for one month of additional professional fees. Of that amount, however, only a portion was estimated for negotiating a final agreement with REI. Tr. p. 113. The balance was attributed to fees expected to be incurred ˙to negotiate the terms of a plan relating to the distribution of the preferred stock, for litigation outside the bankruptcy court, and as a result of delaying conclusion of the case. Tr. pp. 74–76, 79–80, 112–13. Thus, it is not at all clear that a discount of the full $400,000 sum for professional fees was appropriate since a portion was attributable to litigation fees that would be incurred in any event.

E & Y further discounted the preferred stock's stated value by $1.7 million. Assuming a ten year redemption and a twenty-five percent discount rate based on trading ranges in the public market and illiquidity of the preferred stock, the present value was calculated to be approximately $1.3 million. Tr. pp. 48–49. The conversion feature was considered to be of little value because REI proposed to place "a great deal of debt ... upon the company, [but] the equity value would be only the [$6 million] equity that [REI would] put in at the date of the closing. . . ." Tr. pp. 105–06, 109–10.

Most significant to E & Y and to the Committee was that the REI bid, unlike the D & S bid, is contingent on obtaining financing. REI, although purporting to be able to close "within a time frame substantially the same as that anticipated by D & S," and to receive a response from their lender within forty-eight hours of the time of the bid, sought as an additional condition to closing, for an indefinite time, the issuance of financing commitments by REI's lenders. Ex. A; Tr. pp. 84, 115–16. No guarantee of the obligations of the acquisition vehicle, a shell corporation with only $6 million in proposed equity, would be provided. Tr. pp. 84, 114–15.[4]

---

**3.** At the May 8, 1990 hearing, however, the parties to the Agreement acknowledged that the transaction was not contingent on retaining current management. Tr. pp. 30–31. Thus the provision calling for termination upon appoint-

ment of a Chapter 11 trustee was struck from the Agreement on consent. Tr. pp. 31–32.

**4.** The Court received from counsel to Debtor a letter dated June 1, 1990 alluding to a modified bid from REI dated May 25, 1990, the Debtor's

Although the Agreement is not contingent on an employment arrangement with McCall's senior management, Tr. p. 131, D & S has negotiated an agreement in principle with senior management. Tr. pp. 132, 141. None of McCall's senior management has any prior connection to or relationship with D & S. Tr. p. 139. The employment agreements would provide for compensation and bonuses at approximately current levels. Tr. pp. 133–34. Twelve managers would have the right to earn, over a five year period, approximately ten percent of the company's equity; equity will automatically vest at a rate of one percent per year upon continued employment and an additional one percent per year if certain performance goals are met. Tr. p. 135. No "sign-up" bonuses would be awarded. Tr. pp. 134–35. Continuation of current automobile policies is contemplated. *Id.*

The Court terminated McCall's exclusive period, provided in section 1121 of the Code, for filing a plan on November 13, 1989. To date, only two plans, each incorporating a merger agreement with McKane Robbins, have been filed. Those plans were withdrawn when that transaction terminated.

## II

Among the most significant protections of Chapter 11 in the process leading to confirmation of a plan are: the right of creditors to receive a disclosure statement, § 1125; the power of creditors holding claims in an impaired class to vote, § 1126; the entitlement of dissenting creditors and equity interest holders to a return equal to or greater than that which they would receive in a liquidation pursuant to Chapter 7, § 1129(a)(7); the requirement that a dissenting class of unsecured creditors be paid in full prior to the receipt or retention of property under a plan by a holder of a junior claim or interest, § 1129(b)(2)(B); and the ability of all parties-in-interest to

be heard at a confirmation hearing as to matters affecting confirmation, such as good faith, § 1129(a)(3); continuance of management, § 1129(a)(5)(A)(ii); and feasibility, § 1129(a)(11). So significant are these rights and powers that a party-in-interest need have done nothing during the Chapter 11 case in order to avail itself of them at confirmation.

The general goal of debtors and the creditors' committees with whom they principally negotiate is the formulation of a largely consensual plan. Cases involving numerous disputed claims, partially subordinated creditors, disputes concerning estate property, and the like require that consensus be built gradually by putting the plan's building blocks in place through negotiated settlements. *See In re Flight Transp. Corp. Securities*, 730 F.2d 1128, 12 Bankr.Ct.Dec. 11, Bankr.L.Rep. (CCH) ¶ 69796 (8th Cir. 1983); *In re Grant Broadcasting, Inc.*, 71 B.R. 390 (Bankr.E.D.Pa.1987); *In re Lion Capital Group*, 49 B.R. 163, 12 C.B.C.2d 1031 (Bankr.S.D.N.Y.1985). Businesses seeking to reorganize may need to trim their sails through selling assets and attracting additional capital in order to finalize negotiations with creditors and equity committees.

These needs create a tension with party-in-interest protections at confirmation. Nowhere does the Code address this tension. The courts balance these concerns on a case by case basis. Most noteworthy of these cases are those attempting to articulate applicable standards for approval of the sale of estate property under section 363(b).[5] *See e.g., Institutional Creditors v. Continental Air Lines (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 13 Bankr.Ct.Dec. 1371, 13 C.B.C.2d 1433, Bankr.L.Rep. (CCH) ¶ 70945 (5th Cir.1986); *In re the Lionel Corp. (The Committee of Equity Security Holders v. The Lionel Corp.)*, 722 F.2d 1063, 11 Bankr.Ct.Dec. 553, 9 C.B.C.2d 941, Bankr.L.Rep. (CCH)

response thereto, and a confidentiality agreement executed by REI and E & Y. Since none of these items was made a part of the record on this motion, nor served on Holdings, they are not considered.

5. Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

¶ 69510 (2d Cir.1983); *PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 10 Bankr.Ct.Dec. 933, 8 C.B.C.2d 522, *reh. denied*, 705 F.2d 450 (5th Cir.1983).

In *Lionel*, the Second Circuit recognized the danger of "swallow[ing] up Chapter 11 safeguards" through a pre-confirmation sale of a principal asset and thereby cashing out much of the going concern value of the debtor. 722 F.2d at 1069. The debtor proposed to sell its most significant asset: 82% of the common stock of a solvent, publicly traded corporation. It filed a plan of reorganization conditioned on the pre-plan sale and distribution of sale proceeds to creditors. The bankruptcy court found cause to sell in the creditors' committee's insistence upon it and the perception that failure to confirm a plan contingent on approval of the sale would delay reorganization for at least a year. Reasoning, *inter alia*, that if no business justification need be shown, the Chapter 11 safeguards noted above would be denied, the Second Circuit reversed the district court's affirmance. It held that "there must be some articulated business justification ... for using, selling, or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)." 722 F.2d at 1070.[6]

Consequently, in *In re Beker Indus. Corp.*, 64 B.R. 900, 905–07, 14 Bankr.Ct. Dec. 1238 (Bankr.S.D.N.Y.1986), *rev'd in part on other grounds*, 89 B.R. 336 (S.D.

N.Y.1986), this Court found, applying the *Lionel* factors, lack of business justification for sale of a major set of linked assets where a debtor had yet to identify a path for a plan of reorganization. There, a debtor sought to sell a phosphate fertilizer plant and its interest in a related partnership located in Idaho. The debtor also owned another plant and a subsidiary owned a mine both located on the coast of the Gulf of Mexico. The Gulf Coast operations were forecast to operate at a negative margin in the ensuing months and a postpetition financing commitment would expire soon thereafter. The Court reasoned that

> although it cannot be said that the funding necessary for a plan will likely be present in the near term, this is a case where the debtor, its creditors, and its shareholders will be making key decisions necessarily and dramatically affecting the contents of a plan and the ability to reorganize.

64 B.R. at 906. Since it was not clear that, were the Idaho assets sold, the Gulf Coast Operations could be salvaged or that the Idaho assets would not contribute to the reorganization, there remained a possibility that the Idaho assets could serve as a vehicle for attracting investment capital. The consideration for the sale being insufficient to satisfy claims and depriving the estate of any possible future value, the motion was denied as premature and without good business reason.[7]

---

**6.** The *Lionel* Court prescribed the following factors to consider in determining whether business justification exists:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions, and perhaps most importantly, whether the asset is increasing or decreasing in value.

722 F.2d at 1071. *See also Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 389–90, 14 C.B.C.2d 1298, Bankr.L.Rep. (CCH) ¶ 71113 (6th Cir. 1986); *In re Brethren Care of South Bend, Inc.*, 98 B.R. 927 (Bankr.N.D.Ind.1989); *In re Indus.*

*Valley Refrig. & Air Cond. Supplies, Inc.*, 77 B.R. 15 (Bankr.E.D.Pa.1987); *In re Beker Indus. Corp.*, 64 B.R. 900, 905–07, 14 Bankr.Ct.Dec. 1238 (Bankr.S.D.N.Y.1986), *rev'd in part on other grounds*, 89 B.R. 336 (S.D.N.Y.1986) (adopting and/or applying the factors enumerated in *Lionel* ).

**7.** It was also noted in *Beker*, 64 B.R. 900, that pre-confirmation abandonment of estate property under § 554 raises the concern of *de facto* plans. Section 554(a) provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). Thus this Court stated in *Beker*, that while the express requirements of § 554(a) are generally sufficient to justify abandonment in Chapter 7 which seeks expeditious liquidation of assets for distri-

Irrespective of the existence of business justification for a pre-confirmation transaction, the terms or effect of such a transaction may nevertheless threaten to subvert the protections of Chapter 11. Such a transaction was proposed in *Braniff*. There, a debtor airline sought approval of a settlement among itself, certain unsecured creditors, and certain secured creditors. Essentially, the settlement provided for Braniff's transfer of cash, airplanes and equipment, terminal leases, and landing slots to a purchaser in return for travel scrip, secured notes, and a profit participation in the purchaser's proposed operation. The Fifth Circuit reversed the district court's affirmance of the bankruptcy court's approval under section 363(b) because certain portions of the transaction were clearly outside the scope of that section.

In particular, the Fifth Circuit held that since the purchaser would tender a $7.5 million scrip to Braniff for $2.5 million and the scrip could only be used in a future Braniff reorganization and issued to former employees, shareholders or certain unsecured creditors, the transaction "had the practical effect of dictating some of the terms of any future reorganization plan." 700 F.2d at 940. Had a plan failed to allocate the scrip in accordance with those terms, the estate would have forfeited a valuable asset. In addition, a provision requiring the secured creditors to vote a portion of their deficiency claim in favor of any future plan approved by a majority of the unsecured creditors' committee would "thwart the Code's carefully crafted scheme for creditor enfranchisement where plans of reorganization are concerned." *Id.* Lastly, a provision requiring release of claims by all parties against the debtor, its secured creditors, officers and directors was not a "use, sale or lease" and could not be authorized under section 363(b). Such attempts to specify the terms of a reorganization plan require "scal[ing] the hurdles" erected in Chapter 11. *Id.*[8]

The Fifth Circuit subsequently reaffirmed, in *Continental*, that a "debtor in a Chapter 11 case cannot use section 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization," for to so allow would render "creditor's rights under, for example, 11 U.S.C. §§ 1125, 1126, 1129(a)(7) and 1129(b)(2), meaningless." 780 F.2d at 1227–28. It also recognized, however, that post-petition, pre-confirmation transactions outside the ordinary course may be required and that each hearing on a section 363(b) transaction cannot be a mini-hearing on plan confirmation. *Id.* Accordingly, the Fifth Circuit held that when an objector asserts that a transaction is a *de facto* plan, it must specify exactly the protection being denied. 780 F.2d at 1228. *See also In re Terrace Gardens Park Partnership*, 96 B.R. 707, 714, 19 Bankr.Ct.Dec. 727, 20 C.B.C.2d 1183 (Bankr.W.D.Tex.1989).[9]

---

bution, they inadequately address Chapter 11's goals of reorganizing the business and providing jobs for employees, payment to creditors, and return to shareholders. Because abandonment would entitle a secured creditor to foreclose upon the property, the stay no longer being in effect as to that property, 11 U.S.C. § 362(a), abandonment effectively disposes of estate property without the benefit of procedures for plan confirmation. Creditors and shareholders, therefore, are entitled to articulation of a good business reason for pre-confirmation abandonment. Saving maintenance costs was not enough in view of the Court's holding that maintenance could be recovered under § 506(c) of the Code.

**8.** *See also In re Fremont Battery Co.*, 73 B.R. 277, 15 Bankr.Ct.Dec. 1222 (Bankr.N.D.Ohio 1987) (proposed sale of substantially all of debtor's personalty with proceeds to satisfy a single se-

cured creditor or, in the alternative, exchange of such assets for stock of company which would assume the debtor's net operating loss carryover, not approved under § 363(b), there being no business justification: a single secured creditor would benefit, the carryover was not depreciating, and no asset would be left around which to reorganize. Such was an abuse of Chapter 11 and its practical effect was to dictate the terms of a plan and "restructure the debtor-creditor relationship." 73 B.R. at 219.

**9.** Some courts have considered relevant in addressing the *de facto* plan argument whether a debtor intends to file a liquidating plan. *See, e.g., Flight Transportation*, 730 F.2d at 1135 and *In re Naron & Wagner Chartered*, 88 B.R. 85, 18 Bankr.Ct.Dec. 18 (Bankr.D.Md.1988) (where debtor intended to propose a liquidating plan, sale of all assets remaining in its non-viable accounting practice approved under § 363(b) in

Applying these principles, the court in *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 18 Bankr.Ct.Dec. 779, 20 C.B.C.2d 441, Bankr.L.Rep. (CCH) ¶ 72524 (Bankr.N.D.N.Y.1988), declined to approve a lease, pending approval or rejection of a disclosure statement, of the debtor's premises and personalty to a former employee in anticipation of a sale, pursuant to a plan, of its printing and copying business to the former employee. The court observed that although notice of a pre-confirmation transaction under section 363(b) could constitute a sufficient substitute for Chapter 11 safeguards, the notice in that case was insufficient. It held that since the lease would effectively put the purchaser in charge of the business, the court viewed the lease as "part of a sale which is the centerpiece of the proposed plan," and that the "approval of th[e] lease [would] effectively put the court's imprimatur on the sale and confirm the plan long before the hurdles of Chapter 11 are overcome." 92 B.R. at 983.

The same concerns are raised by pre-confirmation transactions out of the ordinary course of business not within sections 1107 and 1108.[10] The court in *In re Public Service Co. of New Hampshire*, 90 B.R. 575 (Bankr.D.N.H.1988), recognized as much in considering a restructuring of the debtor to transfer control and management of a nuclear plant from a division of the debtor to a separate corporation to be controlled by a board of directors representing each of the joint owners of the plant. Like this Court in *Beker*, it rejected the good faith business judgment standard urged by the debtor in favor of consideration of good business reasons in light of the posture of the bankruptcy case as a whole. 90 B.R. at 580–81. In denying the motion, the court stated that the

appropriate standard for approval or disapproval of a transaction [out of the ordinary course of business under sections 1107 and 1108] . . . is whether good cause has been shown to implement the transaction at this stage of the proceeding, *i.e.*, does it have valid business reasons supporting it and does it make good sense in the overall context of the reorganization process? Phrased negatively, . . . [would] the transaction . . . improperly and indirectly lock the estate into any particular plan mode prematurely and without the protection afforded by the procedures surrounding a disclosure statement and confirmation hearing in a plan of reorganization.

90 B.R. at 581.

Pre-confirmation settlements have also been assailed as *de facto* plans. *Flight Transportation*, 730 F.2d 1128; *Grant*, 71 B.R. 390; *Lion Capital*, 49 B.R. 163. The *Grant* Court, however, has expressed blanket disapproval of such an argument. It focused on the distinction between new, post-petition transactions such as "use, sale or lease" of estate property under section 363(b) and settlements. It stated that were "the distinction blurred, it would be impossible for a debtor to ever resolve a controversy with a creditor with whom it had significant pre-petition contractual relations prior to the confirmation of a plan." 71 B.R. at 398. The court concluded that a contrary rule would require a debtor in a single asset case to formulate a plan within thirty days of a hearing to modify the automatic stay. *See* 11 U.S.C. § 362(e). The court approved the settlement, recognizing it as "an important and necessary first step for the debtor in formulating a [p]lan." *Id.*

Not all courts, including this Court, however, so broadly reject application of the *de facto* plan argument to settlements. In *Flight Transportation*, for example, the

---

light of depreciating value of assets, threat of employees to leave, consideration in excess of liquidation value, and lack of harm to parties-in-interest except for insider creditors, the sale not restructuring rights of creditors and there being no other objection that Chapter 11 protections were circumvented).

**10.** Section 1108 provides that "[u]nless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee may operate the debtor's business." 11 U.S.C. § 1108. Pursuant to § 1107, ". . . a debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a).

district court approved a division of pre-petition segregated funds proposed by creditors of the debtor and representatives of purchasers of the debtor's securities having claims subordinated by section 510(b) of the Code. Recoveries from defendants other than the debtor in pending securities laws litigation, which would not have otherwise been included in the bankruptcy estate, were also to be divided between those parties. The property allocated to creditors was to constitute the bankruptcy estate against which the purchasers would release their claims. The Eighth Circuit affirmed, rejecting the claim that the settlement was a *de facto* plan and holding that the agreement was found to essentially be a compromise of the claim of general creditors and the constructive trust claim of the securities purchasers and not a *de facto* plan. Unlike the agreement proposed in *Braniff*, no terms of a plan were dictated, no franchise was forfeited, and there was no release by any party with an interest in the estate.

So too, in *Lion Capital*, did objecting creditors claim that a settlement between a trust company and a group of creditors was a *de facto* plan. Applying the principles articulated in *Braniff*, this Court found untenable the objections that the settlement impermissibly (i) allocated a fund generated by liquidation of government securities, (ii) required parties to the settlement to vote for a plan embodying its terms, and (iii) permitted only the group to share funds claimed by the trust company. Since both the trust company and the Chapter 11 trustee claimed ownership interests in the fund, division of the funds could not be viewed as payment of dividends requiring a plan. Rather, it freed up assets for the estate and permitted formulation of a plan. 49 B.R. at 177. Unlike *Braniff*, the settlement did not require any party to vote for a plan approved by others and hence forfeit its franchise: it simply prevented any party to the settlement from reneging in future plan considerations.

Only the group had subordination claims against the trust company and it was therefore permissible under section 510(c), applicable in Chapter 11 cases, for them and the trust company to settle those claims by dividing the subject funds.

Taken together, these cases show that major pre-confirmation transactions, such as use, sale or lease of estate property under section 363(b), settlement, abandonment of property under section 554, or a transaction out of the ordinary course of business under section 1108, raise the concern that the scheme of Chapter 11 will be distorted. Consideration of such transactions is, therefore, bifurcated. The proponent of the transaction must first satisfy applicable statutory elements and judicial requirements such as a business justification for the transaction, or, in the case of settlements, satisfy the standards under applicable case law.

The applicable statutory and/or judicial standards being met, the proposed transaction will not, however, be approved as a "creeping" or *de facto* plan if timely objection is made that the transaction, either in fact or in effect, encroaches on a right afforded creditors or equity holders in the Chapter 11 plan process, particularized by the objector.[11] A transaction which would effect a lock-up of the terms of a plan will not be permitted. *See Braniff*, 700 F.2d 935; *Copy Crafters*, 92 B.R. at 983; *PSNH*, 90 B.R. at 581. On the other hand, where a transaction would free assets for distribution, *Lion Capital*, 49 B.R. at 177, and circumvent no Chapter 11 right, it may be approved as a necessary step toward, or building block of, a plan of reorganization. *Continental*, 780 F.2d at 1228; *Grant*, 71 B.R. at 398.

### III

In all the cases discussed, it is noteworthy that the threat to Chapter 11 safeguards was found where approval was sought for a discrete and consummated

---

11. Where business justification is shown for a transaction under § 363(b) and yet the transaction threatens a denial of such a right, the bankruptcy court may consider "fashioning appropriate protective measures modelled on those which would attend a reorganization plan." *Continental*, 780 F.2d at 1228.

transaction. For example, although the term of the lease sought to be approved in *Copy Crafters* was only for the period prior to confirmation, it would have put the prospective purchaser in place and thereby locked the estate into a plan based on the sale of the business to the purchaser. Similarly, in *PSNH,* control of the nuclear power plant would have been transferred outright to a non-debtor entity prior to confirmation. No case cited by the parties or that we have found concerned an agreement that, by its terms, did not transfer control of the debtor or possession of estate property until approval of a disclosure statement and confirmation of a plan incorporating the agreement.

The instant motion seeks only authority for McCall to enter into an agreement providing a basis for a plan and to merge with another entity only if certain conditions, including entry of an order of confirmation reflecting the agreement, are satisfied. Although the Agreement would require McCall not to take certain actions that would materially change the value or character of the company as represented in the Agreement, there is proposed at the present time no consummated use, sale or lease of estate property. Unlike the cases noted above, no finality is proposed and the confirmation process is to proceed.

Because the Chapter 11 protections noted above are so strong and the need to protect

them is so great, we examine the transaction, nevertheless, to see if business justification for entering into the Agreement, *Lionel,* has been established,[12] and whether those protections have been effectively truncated. *Braniff.*

### A

Here, it is not disputed that sale of McCall's business is appropriate. Pattern Mem. p. 4. Thus, the principal business justification for the relief sought is the need to come to binding terms with a purchaser or merged partner so that a plan can be proposed and put to the creditors of this estate. In this, it is not disputed that McCall cannot perform an act out of the ordinary course of business without court order. *See* 11 U.S.C. §§ 1107, 1108; *PSNH,* 90 B.R. 575.[13] Were McCall not authorized to perform the Agreement, Pattern makes no claim that McCall would be legally bound to perform any act in furtherance of confirming a plan incorporating the terms of the merger. *See* Agreement ¶ 2.4. Similarly, if McCall is not bound, Pattern makes no claim that D & S and its affiliates would nevertheless be bound and, absent court approval, the Agreement enforceable against them.

Ample business justification in this case for the proposed acts is found in the goal

---

**12.** Because McKane Robbins has alleged in a separate lawsuit that the Debtor's management attempted to leverage its position through self-dealing in the previously proposed McKane Robbins transaction, Pattern contends that the standard of strict scrutiny requiring proof of not only the good faith of the transaction, but its inherent fairness from the viewpoint of the corporation and interested parties, *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939), is to be applied. No proof supporting that allegation is contained in this record. MP Holdings' obligations under the Agreement, moreover, are not dependent on management contracts. The evidence on this record indicates that management has not exacted a price for its participation. The employment contracts with D & S are to be contingent on confirmation and provide for compensation roughly equal to current compensation.

**13.** Section 363(b) is not applicable for lack of a consummated transaction. Nevertheless, citing

*Command Performance Operators, Inc. v. First Int'l Services Corp. (In re First Int'l Services Corp.),* 25 B.R. 66, 9 Bankr.Ct.Dec. 889, 7 C.B. C.2d 297 (Bankr.D.Conn.1982), Pattern asserted in its initial objection that the transaction is a sale of stock governed by § 363(b). In its memorandum, Pattern applied the standards under that section. In *First Int'l,* however, the bankruptcy court denied a motion for approval of certain agreements providing for sale by stockholders of stock issued by the debtor in consideration for consulting assignments with the corporation and indemnification by the corporation from certain claims, because, *inter alia,* the stock was "so inextricably related to the property of the debtors' estates," § 363(b) required notice and hearing prior to such transfers. 25 B.R. at 70. Here, the stockholders of McCall do not propose to sell their equity interests. Even were they to propose such a sale, the reasoning of *First Int'l* is questionable since such stock clearly would not appear to be property of the estate, but that of the stockholders.

of binding an acquiror to a conditional merger agreement in light of the long, arduous and so far unproductive history of marketing this Debtor. The four prior efforts—one that failed to produce any suitors, another that did not result in an agreement, and two instances where suitors walked away—underscores the business justification here. As Mr. Dimeling stated, D & S will stay around because it has posted a $2 million deposit, as required by ¶ 1.2(b)(i) of the Agreement. Tr. pp. 144–45.[14]

To Pattern, this is not enough. It argues that there is no business justification since the business is not decreasing in value, that the REI bid should be preferred to the D & S bid, and that two provisions of the Agreement precluding capital expenditures in excess of $100,000 and capping professional fees at $3 million since January 1, 1990 are not justified.

The argument regarding lack of diminishing value draws on the *Lionel* Court's statement that whether a major asset is losing value is perhaps the most important factor in examining a debtor's business judgment to sell a major asset pursuant to section 363(b) of the Code. 722 F.2d at 1071. It recognizes that debtors should generally be able, absent other considerations as in *Beker*, to sell diminishing major assets prior to confirmation. The failure to do so could deprive undersecured and unsecured creditors of a maximum dividend. The cashing out of going concern value to the detriment of equity prior to confirmation of a plan is the price equity pays for its junior status. Where, however, the asset is increasing in value, these concerns disappear and equity should be entitled to the protections of the confirmation process, including receipt of its entitlement on liquidation, if any.

Here, however, the prospects of the asset assume less significance because the transaction occurs only if a plan is confirmed. All of the Chapter 11 protections remain in place. All creditors will be able to vote. Since it will receive nothing, equity is deemed to be impaired, 11 U.S.C. § 1124, and its vote cast negatively, 11 U.S.C. § 1126(g), thereby triggering all of the protections that Congress sought to afford it.

In this case, moreover, Pattern concedes that even were the D & S offer rejected, it is highly unlikely that the business would fetch a consideration sufficient to afford a return to equity. Tr. pp. 165–66. While a plan could be envisioned that might, absent a negative vote of unsecured creditors, leave something to equity, no such plan has been proposed although the period in which the debtor had the exclusive ability to propose a plan, *see* 11 U.S.C. § 1121, has long expired. Moreover, the Agreement provides for an upward adjustment for increase in equity of the consideration to be paid by D & S at closing. Any increase in value of the business between now and September 30, 1990 would be preserved for the estate by an adjustment in the consideration payable by MP Holdings. Thus, the possible benefit of increasing value is preserved.

In these circumstances, the prospects of the asset carry far less weight and do not outweigh the need for a pre-nuptial agreement enabling the parties-in-interest to proceed to confirmation.

Pattern's complaint that the D & S bid should not be preferred to the REI bid also is without merit. Even were the REI bid accepted at full face value, *i.e.*, $45 million cash and $3 million preferred stock, and even were it represented that an REI based plan could be confirmed within the same

---

**14.** Although the agreement provides that the disclosure statement, plan, and order of confirmation shall be satisfactory to MP Holdings, the Agreement is not illusory. New York law, made applicable by ¶ 6.7 of the Agreement, provides that provisions such as these do not render a contract illusory because a party such as MP Holdings undertakes to "act reasonably and fairly and found his determination upon grounds which are just and sensible and there-

fore, a necessary implication arises that the correctness of his decision and adequacy of the grounds therefor are subject to the judgment of judicial triers." 22 N.Y. Jur.2d *Contracts* § 294 (1982 & Supp.1989). Indeed, these provisions are common, employed to protect a funder of a plan through the funder's insistence that the documents comply with the Bankruptcy Code and also accord with the contract.

time frame anticipated for confirmation of a D & S based plan, the conditional nature of the REI bid more than justifies the Committee's and Debtor's acceptance of the D & S bid in a slightly lower amount that is not so conditioned. A bid for higher monetary consideration is not necessarily higher and better if it is conditioned on obtaining a financing commitment. That McCall and the Committee weighed that condition in determining whether the REI bid was "more beneficial to the Company or its creditors than the transactions contemplated by th[e] Agreement," see Agreement ¶ 6.3 as modified by the order of April 10, is a business judgment not to be disturbed here.

Moreover, the record reflects that the current offer of D & S is economically equal to the $40 million bid price offered seven or eight months ago, given the time value of money and the professional fees incurred. Tr. p. 90. Indeed, Lewis' prior winning bid of $43 million and the REI bid, only discounted to give effect to the yield on the preferred stock portion, both lie within 3% of the D & S offer. Tr. pp. 46, 92–93, 96, 105.

Also without merit is the contention that there is no good business reason for undertaking not to make any capital expenditure greater than $100,000, Agreement ¶ 4.1(d), or to pay for professional fees related to substantial contributions to this case exceeding $3 million in the aggregate since January 1, 1990, Agreement ¶ 4.1(g). To Pattern, the approval of the break-up fee and $500,000 overbid requirement, and the closing adjustment for change in equity, provide D & S with sufficient protections. But Pattern did not negotiate the Agreement and the Court is not to second guess the inclusion of some provisions as long as the Agreement as a whole is within reasonable business judgment, and the subject provisions do not distort the balance Congress struck in Chapter 11. Cf. In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al., 115 B.R. 34, 37–38 (Bankr.S.D.N.Y.1990) (courts, in passing upon arrangements for post-petition financ-ing under section 364(b)–(d), consider, inter alia, whether the terms would tilt the conduct of the bankruptcy case in a manner inconsistent with Chapter 11, or merely reflect a debtor's business judgment). In addition, those provisions are justified by the need to attract a prospective investor by ensuring that the condition of the business will not substantially differ at closing from that at the time of execution of the Agreement. They simply require McCall to obtain the consent of MP Holdings prior to incurring expenditures. The sums are not unreasonably low. Agreement to them is hardly a breach of fiduciary duty as Pattern claims.

Thus, although the Committee has taken a major role in structuring the proposed transaction with D & S, the Agreement falls well within reasonable business judgment and is justified by more than the Committee's mere insistence. The pressing need in this case to hold a purchaser so that a plan can be considered amply justifies authorizing the Debtor to enter into the Agreement.

**B**

Nor can it be said that the Agreement amounts to a de facto plan subverting the protections that Congress crafted in the Chapter 11 confirmation process. Pattern does not identify any protections that would be denied. The Agreement does require cancellation of outstanding stock, but it makes no contention that equity is entitled to any return. Tr. pp. 165–66. Recital C does set forth certain requisite basic elements of a plan. But those elements are elementary and limited to the bare elements of the proposed merger. Dependent as it is on confirmation of a plan, the Agreement does not deprive any party-in-interest of its franchise rights.

Instead, Pattern principally asserts that the Agreement will have the practical effect of precluding a competing transaction and thereby "lock up" a plan. To this it adds the notion that the Agreement's contemplation of the assignment of certain causes of action to creditors constitutes a de facto plan.

Pattern's "lock up" argument is grounded on two provisions of the Agreement: paragraph 6.3 which would bar the debtor from continuing to market the company and willingly assisting a competing offer for four months; and Recital C which sets forth certain requisites that must be provided in a plan. In constricting the debtor from continuing to market the company and assisting a competing offer, paragraph 6.3 is claimed to chill competing bids and alternative plans of reorganization, thereby ensuring the success of the D & S proposal. Paragraph 6.3, however, also enables any bidder seeking access to books and records to obtain an order from this Court enabling access. Since the Debtor's exclusive right to file a plan under section 1121 of the Code has been terminated, a competing plan may be filed at any time up to confirmation. Thus, it can hardly be said that the Agreement bars competing plans.

To be sure, provisions such as these may deter other bidders somewhat in view of the difficulty in securing acceptance of non-consensual plans. But such limited deterrence is often necessary to bring prospective bidders to the table with serious bids. In *In re United States Lines, Inc.*, Case Nos. 86B–11138–41, the case stalled for six months to the detriment of creditors while prospective bidders hovered on the sidelines. Not until this Court entered an order structuring a bidding process, similar to that established by boards of directors in private transactions, providing for a firm date by which bids, subject to confirmation of a plan, were to be submitted, and further providing that none would be accepted thereafter, was the debtor able to negotiate a contract with one bidder and other bids were made. Rather than preclude Chapter 11 creditor rights, the order enabled them to be exercised with respect to a plan the debtor had been unable to formulate without the order.

The same has occurred here in this case of four previous failures to attract and finalize a proposal to fund a plan. The limited detriment of preventing further marketing of the company for four months, and the Agreement's provision for upward adjustment of the purchase price in the

event of an increase in the value of the business are reasonable and serve to protect creditors. Rather than deprive parties-in-interest of their rights, the Agreement protects their investment through enabling the formulation of a plan when four prior attempts have been frustrated. The creditor body should not be asked to be disappointed again. D & S' posting of $2 million if the Debtor is bound to the limited extent provided in the Agreement lowers that risk and improves the chances for a plan in this case.

Nor can it be said that Recital C in any way limits or distorts Chapter 11 rights and protections. It merely provides that the plan provide for the merger contemplated, that trade and certain debts of up to $3.62 million are to be assumed and paid in full on closing and that other debt, much of which is contractually subordinate, is to receive the proceeds and recoveries of outstanding litigation. Although this outline is assailed by Pattern as contrary to the Fifth Circuit's holding in *Braniff*, it bears little if any resemblance to the transaction at issue there. In *Braniff*, a proposed sale and lease would have committed the debtor to distribute illiquid scrip to certain creditors. The transaction would have dictated the consideration those creditors would receive under plan. Authorizing McCall to perform acts toward confirmation of a plan providing for such assignment does not, however, have the practical effect of binding creditors to such a provision. Here, no transaction is to occur until and unless a plan is confirmed. Assigning creditors the proceeds of litigation in a plan simply distributes the current assets of the company. Although such rights may be of uncertain value, the creditors will have an opportunity to assess their value and to accept or reject the assignment and all other plan provisions with all the protections afforded by Chapter 11.

Also contended is that by requiring MP Holdings to approve all aspects of the plan, the Agreement impermissibly grants D & S the dominant voice in plan negotiations and tips the balance of Chapter 11. As noted above, *see* n. 14, New York law prohibits MP Holdings from passing upon these documents in bad faith. MP Holdings could

not, in good faith, pass upon inter-creditor issues. Moreover, its power to disapprove plan provisions appears to be restricted to those not in conformity with Recital C of the Agreement and related provisions, designed to provide for the merger and discharge of debt that MP Holdings is agreeing to pay for in funding a plan. The goal of encouraging a consensual plan and the protections of Chapter 11 are hardly subverted by granting relief here.

Thus, this motion is completely different from that before the court in *Copy Crafters*. There, the proposed lease of the business to the prospective buyer had the practical effect of a lock-up of the business without the protections of Chapter 11. Here, although the merger would be the centerpiece of the plan to be proposed, the Debtor remains independent and intact, and MP Holdings is not installed prior to creditors casting their ballots and confirmation standards being met.

Rather this case bears more resemblance to *Flight Transportation*, and *Lion Capital* where settlements freeing assets for the estate were approved. Here, a prospective investor is agreeing similarly to provide value if the Debtor reorganizes. Indeed, such a building block is less intrusive than settlements because it is conditioned on confirmation.

In sum, the Agreement is amply supported by good business reasons and is not a *de facto* plan. It is a step necessary to achieve a plan. The motion is to be granted.[15] The foregoing constitutes this Court's findings of fact and conclusions of law.

Settle order.

---

**15.** In its post-hearing memorandum, Pattern contends that the Committee should be estopped from moving for approval of the Agreement which represents and warrants the fair presentation by certain financial statements provided MP Holdings. It is claimed that The Travelers Insurance Company, which chairs the Committee, charges, in litigation pending in district court, certain defendants with providing documents in the same form which were materially false and misleading and induced Travelers to purchase its $35 million debt position. No evidence supporting this contention was adduced at the hearing. The financial statements referred to were not offered into evidence. Pattern's claim that Travelers and the Committee cannot maintain these inconsistent positions is not sustained on this record. Furthermore, even were the Committee estopped, the Debtor has joined in the request for relief.